WILLIAM BALLENTINE, Respondent, v. THE NORTH MISSOURI RAILROAD COMPANY, Appellant.

1. *Bailments—Carriers—Railroad Corporations.*—The amount of business ordinarily done by a railroad is the only proper measure of its obligation to furnish transportation : if, from any reason, there is a sudden influx of freight demanding transportation, the obligation will be met by shipping the freight in the order of time in which it is offered. The freight is to be shipped in the order of time in which it is offered at the particular station, and not with reference to the entire line of the road; but no one station should be furnished with means of transportation to the prejudice and injury of another. The cars should be distributed among the different stations in proportion to the business ordinarily done, so that all freight may be shipped in a reasonable time.

2. *Bailments—Carriers—Railroad Corporations—Negligence.*—A carrier cannot be held liable for negligence if he be prevented from performing his duty by the act of God. A snow storm which blocks up a railroad to the extent that it hinders and delays the running of cars, is such an act.

3. *Bailments—Carriers—Negligence—Damages.*—Carriers are responsible for the natural, ordinary and proximate causes of their acts, but not for such as are remote and extraordinary. The delay occasioned to a plaintiff attempting to ship hogs, and the necessary expenses in feeding and taking care of the same, would be the natural and immediate consequence of the wrong done by the carrier in refusing to receive and ship the freight, but this cannot be said in reference to the loss occasioned either by the death or shrinkage in weight of the hogs, unless it appear that these effects were in some manner caused directly by the act of the carrier.

*Appeal from St. Louis Court of Common Pleas.*

Instructions given for the plaintiff:

1. The court tells the jury that on the 15th day of December, 1863, and from thence till the —— day of January, 1864, it was the duty of defendant to furnish sufficient accommodation and rolling stock for the transportation within a reasonable time of all freight and live stock that were offered for transportation at the place of starting, at the junction of other roads, at the several station houses and stock yards on the road, and take the same without any unnecessary delay in the order in which such freight and live stock were offered, and transport the same to any place on the line of said road, or to such point on said road as the shippers or consignees should designate; and if they should believe from the evidence that plaintiff had at Allen, a station on said road, on the 15th day of December, 1863, 500 pork hogs that he designed to ship to St. Louis, on defendant's road; that on said last named day the freight agent of defendant at Allen was notified thereof and requested to ship said hogs; that said hogs were kept at said station a reasonable time awaiting shipment, and that plaintiff was ready and willing to pay the freight thereon; that for want of such sufficient accommodations defendant neglected and refused to ship said hogs within a reasonable time, they will find for plaintiff, unless they shall further believe from the evidence that there was a sudden, unforeseen and unsuspected influx of freight and live stock at the several stations on the road beyond the capacity of the rolling stock on the road to carry away in a reasonable time, which prevented defendant carrying plaintiff's hogs in such a reasonable time and in the order in which they were offered.

2. What is a reasonable time in which freight like that in controversy should be shipped after it is offered, is a question for the jury to determine, and in so doing they should take into consideration all the circumstances detailed in evidence.

3. That on the 1st day of December, 1863, and until the

23d day of January, 1864, it was the duty of defendant, within a reasonable time and without unnecessary delay, to ship all the freight and live stock that should within the time aforesaid be offered for transportation at the several stations and stock yards on said road to any other place on their line of said road, or to such point on said road as the shipper or consignee should designate, and in the order of time such freight and live stock were offered for transportation at the several stations and stock yards on said road. And if they belief from the evidence that plaintiff had on the 15th day of December, 1863, at Allen, a station and stock yard on said road, 500 pork hogs that he desired to ship on said road to St. Louis, and was ready and offered to pay the freight thereon, and so informed the freight agent at Allen; that said hogs remained at said station until about the 17th day of January, 1864, ready for shipment, and that between the days last aforesaid the defendant might and should have shipped the said hogs according to the rule above stated, but that during the said time defendant neglected and refused to ship said hogs, and did ship live stock for other persons which had been driven to and first offered for shipment at any of the stations and stock yards on said road after the plaintiff's hogs were so offered, to the prejudice of plaintiff's right to have his hogs shipped in the order of time in which they were offered for shipment at said Allen station, then they will find for the plaintiff on the fifth count in the petition. And if they also find that said hogs were aftewards, on or about the 23d day of January, 1864, shipped by defendant from Martinsburg station, on said road, the measure of damages will be the expense of keeping, feeding and taking care of said hogs from the day on which they should have been shipped till the day they were shipped, as also the loss incurred in the shrinkage in weight of said hogs between the times last aforesaid, if any, and also the loss occasioned by the dying of any of said hogs by reason of such delay in shipping said hogs from the day they should have been shipped till said 23d day of January, 1864, provided they find from the evi-

dence that said shrinkage in weight and death of hogs were not occasioned by any want of care on the part of plaintiff in feeding and taking care of said hogs.

4. If the jury believe from the evidence that on the 18th and 19th days of January, 1864, defendant received two car loads of dead hogs at Allen station, to be delivered to plaintiff in St. Louis, and that defendant failed and neglected to deliver said hogs in St. Louis or elsewhere to plaintiff, they will find the issue on the second count for the plaintiff, and will assess his damages at the value said hogs have been proved to be worth ; and if they further find that Chapman, the station agent at Allen, assumed to pay the freight on said dead hogs to said company, and said company accepted such assumption and held Chapman responsible therefor, they will also find the amount of such freight for plaintiff.

5. If the jury believe from the evidence that on the 23d day of January, 1864, defendant received on one of its freight trains 17 dressed hogs in good order, to be thence transported to St. Louis within a reasonable time, and that defendant failed and neglected to so deliver said dressed hogs in St. Louis or elsewhere, to plaintiff, within a reasonable time, they will find the issue on the third count for the plaintiff, and assess the damages at the amount proved to have been sustained by plaintiff by reason of such failure and neglect.

Plaintiff's instruction refused :

1. To constitute such sudden, unforeseen and responsible influx of freight and stock a defence to this suit, it must appear that defendant had used and run as much rolling stock as could be used and run on the road with safety to its operations.

Defendant's instructions given :

1. The jury are instructed that there is no evidence before them which is sufficient in law, if true, to warrant them in finding a verdict for the plaintiff on the first count of his said petition, founded on a supposed special contract.

2. If the jury believe from the evidence that the plaintiff

shipped on said road the dead hogs in the second count of his petition mentioned to be carried to St. Louis, and that the same were carried and delivered to the plaintiff or his agent at St. Louis, or that the same were deposited in the warehouse or usual place where such freight is placed, and that the plaintiff or his agent had notice or knowledge of the arrival of said hogs at such place ready for delivery to him, or of the time when said hogs would arrive there, they will find for defendant on said count.

3. If the jury believe from the evidence that the loss in said dressed hogs (in the third count of said petition mentioned) was occasioned by the warmth of the weather, and the natural and inherent infirmity and tendency of such freight to damage under the influence of a change in the weather from cold to warm, and not by any carelessness or negligence on the part of the defendant, its officers or servants, they will find for the defendant.

Defendant's instructions refused:

1. The jury are instructed as to damages in case they find for plaintiff on either the fourth or fifth count of said petition, that if they believe from the evidence that said hogs, or any of them, died from freezing, or the effects of excessive cold in the weather, or were smothered by piling together in consequence of such cold in the weather, or died through want of proper care on the part of the plaintiff or the persons having charge of them, they will not include the value of such hogs in their assessment of damages.

2. The jury are instructed as to damages in case they find for plaintiff on either said fourth or fifth count, that if they believe from the evidence that the loss by shrinkage in weight of said hogs, or any of them, was occasioned by insufficient feeding or want of proper care on the part of plaintiff or the persons having charge of them, or by the effect of excessive cold in the weather, they will not include any such loss in their assessment of damages.

3. The jury are instructed that if they believe from the evidence that previous to said month of December, 1863, the

defendant had furnished and had on said road sufficient accommodation and rolling stock for the transportation of all freight and live stock that was ordinarily and generally offered for transportation on said road within a reasonable time after the same were offered, and that during said months of December and January the defendant kept all of its available accommodation and rolling stock employed with reasonable diligence in receiving and transporting the freight and live stock that were offered for transportation on said road ; that during said month of December there was an unusual influx and an extraordinary press of freight and live stock for transportation on the road beyond the capacity of the road and all accommodations and rolling stock to receive and transport immediately and at once, and that while the said hogs of plaintiff (in the fifth count in his petition mentioned) were waiting to be received in turn after they were offered for transportation, in the order of time and priority in which they were so offered, there occurred along the line of said road a severe and unusual snow storm and great cold, obstructing the operation of said road and hindering it from thereafterwards receiving and transporting said hogs of the plaintiff in the order of time and priority in which they were offered for transportation thereon, then defendant is not liable on the ground and for the reason merely that the plaintiff's said hogs were not received and transported (even if they were not) in the exact order of time and priority in which they were offered, in view of the operations and business of the whole road, at all the stations, junctions, and stopping-places thereon.

*Moss & Hunton*, and *Orrick*, for appellant.

It will be observed, this action is simply for a breach of contract, and the only questions therefore presented for decision of the court are—1. Was there a breach of contract? 2. If so, what is the measure of damages?

I. As to the first point, it will not be disputed that if the delay in shipping the hogs arose from any of the causes for

which the law exonerates the carrier, there will be no breach. Applying this test, what were the operating causes?

1st. That defendant's rolling stock was sufficient for its usual and ordinary business.

2d. That there was an unusual, unsuspected and unprecedented influx of live stock on defendant's road, and also that a violent snow storm had interfered with and obstructed the business operations of the same, contributing with other causes (as the extreme cold forming ice, &c.) to the delay in plaintiff's shipment.

But either, or both of these causes conjoined, excuse or exonerate the carrier as to delay. The snow storm and cold certainly, being the "act of God," affords a perfect defence to a loss, and *a fortiori* to a delay. As to time, the carrier is not an insurer. The carrier may excuse delay by accident or misfortune, although not inevitable or produced by the "act of God"—Redf. on Railw. 318–19, & notes; 14 Wend. 210; Ang. on Carr. § 289; Hadley v. Clark, 8 T. R. 259; 2 Kern. 250–1; Conger v. Hudson River R.R. Co., 6 Duer, 375; Gal. & Chic. Un. R.R. Co. v. Rae et als., 18 Ills. 489; Weibert v. N. Y. & Erie R.R., 19 Barb. 36.

II. This being for breach of contract, the damage allowed should be such alone "as may fairly be considered as having been in the contemplation of the parties at the time the agreement was entered into." This is a rule borrowed from the civil law, and has all the advantage of greater simplicity and certainty than the somewhat arbitrary formula of "natural and proximate consequence," besides more closely following the analogies of law in the construction of contracts in which the intent is to govern.

There is this difference, however: while in the civil law prominence is given to fraud in questions of damage, it is not so in common law as borrowed therefrom. The question simply is, was there a breach? This test, as first laid down, is supported by the following authorities, and seems to be the tendency in modern decisions: Sedg. on Dam. 116; id. 61–78; 2 Smith's Lea. Cas. 537 et seq.; Redf. on Railw. 234,

§ 125; 6 Barb. (S. C.) 425; Hadley v. Bafendale, 26 Eng. Law & Eq. 398; S. C. 9 Exch. 341; Blanchard v. Ely, 21 Wend. 348; Masterson v. Mayor, &c. Brooklyn, 7 Hill, 68; Fox v. Harding, 8 Cush. 524.

Applying this test, can it be supposed that "in the contemplation of the parties" such a storm and extreme cold was imminent, and that such results would follow? Had it been shown or urged that to avoid the storm, or in contemplation thereof, the shipment was desired, there might be some reason for the claim urged by plaintiff; but such is not the case. It was a winter unprecedented for its storms and severity, and how, then, could it have been in the minds of the parties? Could its effects be foreseen? There is no foundation for the supposition that such damages as alleged in plaintiff's petition could have been contemplated as springing or arising from any breach of contract in shipping. But under either theory the damages claimed were too remote; the loss by death and shrinkage was from the excessive cold. Morrison v. Davis Co., 2 Penn. 171; Vedder v. Hildreth, 2 Wis. 427; Denvy v. N. Y. Central R.R.,13 Gray, 481; Darwin v. Potter, 5 Denio, 306; Clark v. Pacific R.R. 39 Mo. 184. Defendant's 1st and 2d instructions should therefore have been given, as they embodied the law as applicable to the case; and plaintiff's instruction as to the measure of damages should have been refused.

*Hicks & Doniphan,* for respondent.

I. Whenever a charter is granted for the purpose of constructing a railroad, and the corporation is clothed with the power of taking private property in order to carry out the object, it is an inference of law, from the extent of the powers conferred and the subject matter of the grant, that the road is for the public accommodation—1 Amer. Railw. Cas. 350-2; Wooster v. Western R.R. Co., 24 Penn. 378; Sanford v. R.R. Co., 2 Kern. 246; Weibert et al. v. N. York & Erie R.R. Co., 19 Barb. 36; Pierce on R.R. Law, 414-15.

II. The public being so entitled to these advantages, it re-

sults from the nature of the right that the benefit should be extended to all alike; that no special favors should be granted to any man or set of men, and denied to others. See above authorities, and especially 24 Penn.

III. That although there are statutory provisions which in a manner define the duties and liabilities of defendant, yet that there are duties and liabilities other than those annunciated in the statutes, which the defendant is bound to do and perform; among which is one, that when freight, from any cause or causes, accumulates at the station houses and stock yards on the road, beyond the immediate capacity of the rolling stock of the road to carry away in a reasonable time after the same was and is offered for transport on the road, it is the duty of defendant to carry away such accumulated freight and live stock in the order and priority of time in which it was offered at the several stations and stock yards on the road; that is to say, that the freight and live stock first offered for shipment at any of the stations and stock yards on the road should be first shipped—24 Penn. 378; 2 Kern. 245, 252; 18 Ills. 489.

IV. It was and is the duty of defendant to ship the freight and live stock offered for transport on the road in the order and priority of time in which it is offered for transport at the several stations on the road; that is to say, that freight including live stock first offered for transport at any of the stations and stock yards on the road should be shipped before that subsequently offered for transport at any of these stock yards and stations on the road—24 Penn. 378; 2 Kern. 245, 254; Pierce on R.R. 414–15.

V. It was and is the duty of defendant to provide sufficient accommodation and rolling stock to carry away all the freight and live stock that was or is offered for transport at the several stations and stock yards on the road within a reasonable time after the same was and is offered. See the authorities above cited, and R. C. 1855, p. 435.

VI. A common carrier in order to claim exemption from liability for damages done to the goods in his hands in course

of transportation, injured by what is called the "act of God," must be without a fault himself; his act or neglect must not concur and contribute to the injury. If he departs from his line of duty and violates his contract, and while then in fault and in consequence of that fault the goods are injured by the act of God, which would not otherwise have caused damage, he is not excused or protected—Reed v. Spalding, 5 Bosw. (N. Y.) 395, 406, 408; Wash v. Homes, 10 Mo. 15; Collier v. Valentine, 11 Mo. 307; Smith et al. v. Whitman et al., 13 Mo. 352; Hill v. Sturgeon, 28 Mo. 327; Davis v. Godnett, 6 Bing. 716; 3 Kent, 210; Hart v. Allen et al., 2 Watts (Penn.) 114.

FAGG, Judge, delivered the opinion of the court.

The law defining and regulating the duties of railroad companies as common carriers, is so well settled now as to admit of little doubt or controversy. As preliminary, however, to the determination of the questions involved in this case, it may be stated that the laws of the State require each railroad corporation to "furnish sufficient accommodations for the transportation of all such passengers and property as shall, within a reasonable time previous thereto, be offered for transportation," &c.—R. C. 1855, p. 435, § 44. The sufficiency of such accommodations must be determined by the amount of freight and the number of passengers ordinarily transported on any given line of road. The duty of a company to the public, in this respect, is not peculiar to any season of the year, or to any particular emergency that may possibly arise in the course of its business. The amount of business ordinarily done by the road is the only proper measure of its obligation to furnish transportation. If by reason of a sudden and unusual demand for stock or produce in the market, or from any other cause, there should be an unexpected influx of business to the road, this obligation will be fully met by shipping such stock or produce in the order and priority of time in which it is offered—Galena & Chicago R.R. Co. v. Rae et al., 18 Ills. 488; Weibert v. N.

Y. & Erie R.R. Co., 19 Barb. 36. Any other construction of the statute would be unjust to the railroad companies without benefiting the public.

It seems to have been the theory upon which the petition proceeded in this case, that it was the duty of the defendant to have shipped the live stock in the order of time in which it was offered with reference to the entire line of its road, and not to any particular station. This is altogether unreasonable, and in its practical operation would work great hardships upon all companies. Its duty in this respect, then must be understood in reference to each particular station, and not to the operation of the road as a whole.

Whilst it may be difficult to lay down any general rule upon this subject sufficiently accurate in its terms to cover all cases that may possibly occur, still we think it can be approximated by saying that its means of transportation must be so distributed at the various stations for receiving passengers and freight along the entire line of its road, as to afford a reasonable amount of accommodation for all. Or, to state it differently, no one station should be furnished with means of transportation to the prejudice of another, but a distribution should be made among all in something like a just proportion to the amount of business ordinarily done at each. Its duty is to receive all freight that may be offered, and within a reasonable time, and in the order in which it is offered, to transport the same to any other point on the line of its road that may be designated by the owner or other person having charge of it. This duty to the public must be performed in good faith, and without partiality or favor to any one. Every individual in the community, by complying with the prescribed rules and regulations of the company, has an equal right to demand the performance of this duty, and the law does not excuse a discrimination in this respect any more than it does a discrimination in favor of any particular station on the line of its road. In every proceeding, therefore, against a railroad company for neglect of its duty, either in receiving or shipping freight in the order

in which it is offered, the good faith of its conduct· in the matter complaind of is a proper subject of inquiry, and if found to be wanting, should receive the severest condemnation and censure from the courts of the country.

The petition contains five counts, charging the defendant with neglecting its duty in failing and refusing to receive for shipment a large number of hogs offered at one of its stations called Allen, and also for failure to deliver a lot of dead hogs, and for failure to deliver, in a reasonable time and in good order, a certain lot of dressed hogs, all shipped at said station for the city of St. Louis. The first alleged a special contract for the shipment of a large number of hogs within a given period of time. Under the instructions of the court below, the issue on this count was found for the defendant. The second alleged a shipment of a large number of dead hogs from Allen station to St. Louis, and an entire failure of defendant to deliver any portion of them. The third was for a like shipment of 17 dressed hogs, not delivered in good order and within a reasonable time. The fourth and fifth counts simply varied the statement of the same cause of action substantially. The jury, in the verdict, returned a separate finding and assessment of damages under each of the last four counts in the petition. This finding was stated to be what was understood to be their duty under the instructions of the court, and coupled with the further statement that their intention was to assess the whole amount of damages returned, $3,728.78, under the third and fifth counts alone. Plaintiff thereupon elected to take his damages so assessed, and judgment was entered accordingly.

As to the finding of the jury on the third count there is no·controversy here, and we pass to the consideration of the question as to whether the jury was properly directed as to the liability of the company and the measure of damages in such cases. Plaintiff's claim for damages on the fifth count was based upon the allegation that on or about the 15th day of December, 1863, in accordance with the rules of the com-

pany, he registered for shipment on said road and at said station 500 fat hogs ; that if all the hogs, then registered at said station, had in good faith been shipped in their proper order, his turn would have been reached by the 25th of said month ; that defendant acted with partiality in shipping for other parties hogs offered for shipment after the date at which plaintiff's hogs were registered, and that from said first mentioned date continuously on until the 17th of January following, his hogs, being at or near said station, were offered for shipment ; that at said last named date they were, by direction of the defendant's agents, driven to another station on the road, and shipped on the 23d of January, 1864 ; that during this period of time plaintiff expended a large amount of money in feeding and taking care of his hogs, that 120 of them died, and that he sustained heavy damages thereby, as well as in the shrinking in weight of the remainder.

These allegations were severally denied, with an averment in the answer that the means of transportation were sufficient to do the amount of business ordinarily required upon the road ; that there was at this period an unusually large quantity of live stock awaiting shipment all along the line of this road, and greatly beyond the capacity of defendant to receive and transport the same as it was offered, and, to add to the embarrassment of the company and in its inability to accommodate the public as speedily as it might otherwise have been done, there was, on or about the 31st day of December, an unusual snow storm, which, with the extreme severity of the weather that followed it, greatly obstructed defendant's road, and for the period of two weeks hindered and delayed the running of trains.

Of the series of instructions given at the instance of the plaintiff it will only be necessary to consider the third, the remainder being treated as substantially correct. An application of the principles enunciated in the preceding part of this opinion will demonstrate the fact at once that the first part of that instruction must be held to be erroneous.

The duty of the company to receive the plaintiff's hogs in

the order of time in which they were offered for shipment, is to be understood as referring to that station and not to all the stations on the road. As to whether the failure of defendant to receive and ship plaintiff's hogs in their proper order and within a reasonable time, was a wilful neglect or refusal to perform its duty, was a question of fact to be considered by the jury, with reference not only to its liability to furnish sufficient means of transportation for this purpose, but also in reference to any other fact that would be sufficient in law to excuse such failure. No argument or citation of authorities is considered necessary to establish the fact that the matter set up in answer by way of excuse, and to show that defendant for a portion of the time of which plaintiff complains was prevented from performing its duty, was, properly speaking, the act of God. The snow storm was described by the witnesses to the extent that it hindered and delayed the defendant in the performance if its duty, should have been considered by the jury. The testimony of John Ballentine, who was the brother and agent of the plaintiff, tends to show that the hogs could not have been shipped previous to the storm, and indeed down to the very time at which they were driven away to be shipped elsewhere. After stating that the 500 hogs mentioned were driven to Allen on the 14th of December, he says : " I understood there were eighty car loads there waiting for transportation when we got there ; I thought we should not get through by spring." This was in his examination in chief. On cross-examination he said, " we got to Allen on the 14th of December. Mr. Salisbury had one or two car loads of hogs. *I dont think our turn would have come before we left in case Salisbury's hogs had* not been taken." No testimony is preserved in the bill of exceptions that conflicts with these statements. With a showing so favorable to the defendant by the plaintiff's own testimony down to a period after the occurrence of this storm (which is described by the witnesses on both sides as one of great severity), the court should have told the jury that it was one of the facts in the case to be consid-

ered by them in determining whether or not the defendant was excused from his liability to receive the hogs within the period of time mentioned in the petition.

The only remaining point for consideration is the question of damages. The elementary books as well as the opinions of the courts attempt to lay down a general rule upon this subject, which is substantially, that carriers are responsible for the natural or ordinary and proximate consequences [of their acts, but not for such as are remote and extraordinary—Sedg. Meas. Dam., 3d ed. 63; 2 Greenl. Ev. § 256; Clark v. Pacific R.R., 39 Mo. 184.

The general statement of the rule is easy enough, but the point of difficulty frequently is to ascertain whether a given case is within it or not. Here the act complained of is the failure to receive in its proper order of priority stock offered for shipment. If the bad faith of the defendant is made to appear, he is liable for whatever damages can be shown to have resulted to the plaintiff as the natural and proximate consequences of its act. The delay occasioned to the plaintiff, and the necessary expenses in feeding and taking care of the hogs, are therefore to be taken in such case as the natural and immediate consequences of the act. But this cannot be said in reference to the loss occasioned either by the death or shrinkage in weight of the hogs, unless it could be made to appear that these effects were in some manner caused directly by the act of the defendant.

The witness, John Ballentine, stated repeatedly in the course of his examination that "the freezing and piling caused the death of the hogs." His testimony in this respect is corroborated by all the witnesses. But very few of the hogs died previous to the occurrence of the storm, and the loss of the plaintiff in this respect, as well as the large amount of shrinkage in the weight of the hogs taken to market, was certainly the natural and proximate consequence of the storm, and not the failure of the defendant.

The snow storm being the act of God, could not have been anticipated by the parties, and in no sense could be called a consequence of the defendant's act.

It was proper in the instructions to the jury to give some prominence to the fact that after plaintiff's hogs had been registered for transportation and out of the proper order of time, two car loads of hogs were shipped for Mr. Salisbury. This was an act of favoritism inconsistent with the duty of the defendant to the public, but it really cuts no figure in this case, for the reason that plaintiff showed by his own testimony that his turn would not have been reached before his hogs were driven away from that station, even if these two car loads had not been shipped. No part of the damages sustained by plaintiff could have been attributed, therefore, directly to this wrongful act.

The instructions asked by the defendant, and refused by the Court of Common Pleas, and numbered in the bill of exceptions as one, two, and three, ought to have been given.

For the giving of an improper instruction at the instance of plaintiff, and the refual of those asked by the defendant, the judgment must be reversed and the cause remanded.

Judge Wagner concurs; Judge Holmes, having been of counsel in the court below, did not sit.