# EDWIN E. KENDALL

*v.*

# SAMUEL A. BROWN.

1. SURGEON — *liability for shortening of fractured limb.* Where a fractured limb is shortened by reason of the want of extension at the proper time, and the extension of the limb could not well and safely be effected, nor the means and appliances for that purpose be safely used before what is called the bony union commenced, and the defendant surgeon treating the case was discharged before such bony union, under proper treatment, would and did commence, and another surgeon was employed, it was *held* that the defendant was not liable in an action for the injury, there being no other charge of unskillful treatment on his part.

2. INSTRUCTION — *proper on a state of facts which the evidence tends to prove.* Where the evidence tends to prove a certain state of facts, the party in whose favor it is given has the right to have the jury instructed on the hypothesis of such state of facts, and leave it to the jury to find whether the evidence is sufficient to establish the facts supposed in the instruction.

3. SAME — *in reference to care of surgeon.* There is no substantial difference in the use of the words " ordinary " and " reasonable " in defining the care and skill required of a surgeon or physician in his employment

APPEAL from the Circuit Court of Warren county; the Hon. ARTHUR A. SMITH, Judge, presiding.

This was an action on the case, brought by Samuel A. Brown against Edwin E. Kendall, to recover damages sustained by the unskillful treatment of a fractured leg of the plaintiff by the defendant, as a surgeon. A trial was had in the court below, resulting in a verdict and judgment of $1,375.17½, from which judgment the defendant appealed.

Messrs. MILLER & FROST, for the appellant.

Messrs. DOUGLASS & HARVEY, for the appellee.

Mr. JUSTICE SCOTT delivered the opinion of the Court:

Appellant is a physician and surgeon, and as such was employed to treat appellee. There is no controversy as to his employment, and that he treated appellee for a period of twenty-nine or thirty days, visiting him every day with the exception of one or two days. The declaration counts upon such employment, that he so unskillfully and carelessly treated appellee's injury that his leg became shortened one and one-half inches, and thereby he suffered great pain. The gravamen of the action is, that through the unskillful treatment of the surgeon in charge, appellee's leg became so much shortened he lost the comparative use of it. The pain alleged to have ensued is set forth by way of aggravation of damages.

On this, the principal question, there is a marked conflict in the evidence, so much so, as to render it doubtful which party ought to succeed. There is no decided preponderance in favor of either party. Commonly, in such cases, we should regard the finding of the jury as settling the controverted facts. And without expressing any opinion as to which way is the weight

of the evidence, we should, perhaps, be inclined to do so now, had the jury been accurately instructed as to the law of the case.

Appellee, either through inevitable accident or the unskillfulness of the attending surgeons, or one of them, has sustained a severe, permanent injury. On the other hand, appellant's professional character is involved in the result. These considerations have induced a most careful and painstaking investigation of the case. We forbear, at this time, to remark upon the evidence, the sufficiency of which to sustain the verdict has been questioned by one assignment of error, for the reason the decision at this time will be placed on other grounds.

That the third instruction asked by appellant and refused by the court, states a correct principle of law, can hardly be doubted. It is, in substance, that if appellee's leg became shortened in consequence of the fracture or during the course of treatment subsequent to the fracture, then appellant is not liable in damages therefor, unless the shortening was due to the want of reasonable care and skill on his part, and if the extension of the limb could not well and safely be effected, nor the means and appliances for that purpose be safely used, before what is called the bony union commenced, and that bony union, under proper treatment, would not and did not commence before appellant was discharged and appellee placed under charge of another surgeon ; and if the shortening could be prevented at all it could only be done by the use of proper extension applied when the bony union did commence, and continued until ossification had sufficiently progressed to hold the leg at its proper length, then appellant would not be chargeable.

The principle of this instruction was all important to the defense. No other given, contained so full and accurate a statement of the law on this branch of the case. Its materiality will be more readily appreciated by a reference to some of the principal facts.

Whatever defects there may have been in appellant's state-

ment prior to his discharge, there is some evidence that tends to show the shortening of appellee's limb was not necessarily the result, and this instruction was better calculated than any other given, to direct the attention of the jury to that theory of the case.

The medical testimony all shows that in the earlier stages of the treatment there are a great many difficulties to be encountered in keeping the fractured limb in proper position, and great difficulties were experienced in treating appellee's injury. It is not then the danger of shortening occurs, as we understand the testimony. It is in the later stages of the treatment that appliances to prevent shortening are used.

The injury to appellee's limb is described as a slightly oblique compound fracture of both bones of the leg, and under the most skillful treatment some shortening of the limb is to be anticipated — a half inch would not be considered, in the judgment of the witnesses, unusual, or evidence of unskillful surgery. The difficulty seems to be to prevent the overlapping, in consequence of which shortening ensues.

All the surgeons examined seemed to agree in the statement that what they called the bony union of the fractured bones, in cases of compound fracture, does not commence to take place much before thirty days after the injury. If there is much inflammation in the soft parts, and suppuration is continually going on, the period of bony union is often very much delayed. The proof shows there was great inflammation in the soft parts of appellee's leg, and suppuration was continually going on. While the wound was in that condition, the surgeons all say there could be expected but little, if any, tendency to union. The theory seems to be, the plastic matter necessary to the bony union would be carried off. It is in proof also, the patient was very much debilitated from bilious attacks. Some of the surgeons examined give it as their opinion it was impracticable, in the condition of the patient, and perhaps unnecessary, to apply extension to the limb at any time before appellant was discharged, basing their opinion

mainly upon the fact that what they called the bony union had not then commenced. The witness Doctor Cooper, the surgeon who had the care of appellee after appellant was discharged, says there was no bony union when he took charge of the case. His testimony is "from the receipt of an injury until the thirtieth day, the bony union is very slight; but from the thirtieth day to the fiftieth day, nature sets herself to work and the consolidation becomes thorough." Doctor Hamilton says: "I would not expect union of bones, under the best circumstances, short of the third week, but not generally so soon as that. I suppose it would range from the third to the sixth week."

There is testimony in the record that tends to show that prior to the time the bony union commences to take place extension is of very little practical use, and the omission to attach appliances for that purpose does not always indicate unskillful surgery. On this subject Doctor Hamilton says: "I would wait and attend to the patient's general condition and keep the limb as steady as I could, and when I thought the soft parts would bear extension I would try it, even if it were on the second or third week; and if I found the soft parts would not bear it, or if it produced a great deal of disquietude, I would desist and let it alone to such time as the swelling had gone down, and after the skin was in good condition, provided it did not go past thirty or thirty-five days, then I would put on some kind of extension and counter extension to reduce the shortening, for at that time you may expect the bony union to take place."

The professional opinions of a number of surgeons were taken as to the practicability, in the condition of appellee's wound and his general health, of applying extension to the limb at any time before appellant was discharged, and on this point Doctor Hamilton says: "My impression is, that it would not have been of much use to try extension until between three or four weeks after the injury had occurred; would not have put on extensions when he was bilious and prostrated on account of the bilious attack, unless there was great urgency;

I don't think there was in this case." Other testimony tends to prove the application of extension might have endangered the life of the patient, and the omission to apply it in his condition was not conclusive evidence of bad surgery or unskillful treatment. Perhaps the common sense of the matter would be, it would be better to risk the shortening of the limb than the life of the patient.

Whether the theory of practice advanced by the appellant is correct, must of course be ascertained from the testimony of persons skilled in that department of medical learning. It is enough, the evidence tends to prove it was not the duty of appellant to apply extension at any time prior to the date of his discharge, and to make it a question to be settled by the testimony of experts whether he could with safety have done any thing to prevent shortening of the limb prior to that time. The refused instruction embodies the whole theory of the defense on this branch of the case, and whether the hypothetical case stated was borne out by the evidence, ought to have been submitted to the jury. It presented one of the vital issues of the case.

There is no substantial objection to the instruction given for appellee. The words "ordinary" and "reasonable" used in defining the nature of the care and skill expected of a physician or surgeon in his employment, have been interchangeably used. *Richey* v. *West*, 23 Ill. 385. Perhaps the word "ordinary" would indicate more clearly to the common mind the degree of care and skill which he is bound to exercise in his professional engagements, or answer in damages for the want of it.

For the error of the court in refusing to give appellant's third instruction the judgment will be reversed and the cause remanded.

*Judgment reversed.*

Mr. JUSTICE CRAIG, having been of counsel for appellee, took no part in the consideration or decision of this case.