BLACK ET AL. v. CHICAGO, B. & Q. R. CO.

[FILED SEPTEMBER 16, 1890.]

1. **Common Carriers:** LIVE STOCK: ACT OF GOD.  A common carrier of live stock is not an insurer against injuries unavoidably resulting from the inherent nature or propensities of the animals, or against loss caused by the act of God.  While a carrier, when overtaken by an occurrence known as the act of God, is not bound to the highest degree of diligence to preserve the property from injury, yet, in such an emergency, he is required to bestow such care as an ordinarily prudent person or carrier would use under like circumstances, and if he fail to do so and loss results therefrom, he is liable.

2. ——:  ——:  ——.  A snow storm of such violence as to prevent the moving of trains is an act of God.

3. The instructions given and refused considered, and *held*, properly given and refused.

ERROR to the district court for Kearney county.    Tried below before GASLIN, J.

*L. W. Hague*, and *Stewart & Rose*, for plaintiffs in error, cited: *A. & N. R. Co. v. Washburn*, 5 Neb., 122; *Kinnick v. R. Co.*, 29 N. W. Rep. [Ia.], 772; *Lindsley v. R. Co.*, 33 N. W. Rep. [Minn.], 7; *Wilson v. Hamilton*, 4 O. St., 722; *K. P. R. Co. v. Nichols*, 9 Kan., 235; *St. L. & S. R. Co. v. Dormon*, 72 Ill., 504; *Agnew v. Costa*, 27 Cal., 425; *Clark v. R. Co.*, 4 Kernan [N. Y.], 570; *Maslin v. R. Co.*, 14 W. Va., 180; Angell, Carriers [5th Ed.], sec. 214; Lawson, Contracts of Carriers, sec. 16.

*Marquett & Deweese*, and *J. L. McPheely*, contra, cited: *Parrish v. State*, 14 Neb., 60; 1 Am. and Eng. Ency. of Law, 174, 177; *Phil., etc., R. Co. v. Anderson*, [6 Am. & Eng. R. Cases, 407] 94 Pa. St., 351; *R. V. R. Co. v. Fink*, 18 Neb., 93; *Gleeson v. Va. M. R. Co.*, 28 Am. and Eng. R. Cases, 202; *Balt., etc., R. Co. v. Sulphur Springs, etc., Dist.*, 96 Pa. St., 65; *Nugent v. Smith*, L. R. 1 C. P. D. 19, 423.

NORVAL, J.

On the 16th day of November, 1886, the plaintiffs delivered to the defendant at Minden, in this state, 136 hogs to transport to Omaha. On account of a severe wind and snow storm, the train on which the hogs were being shipped, was blockaded at Hastings for more than a day. When the cars arrived in Omaha, sixteen of the hogs were dead. Plaintiffs brought suit to recover the sum of $126.62 as their damages sustained. The defendant, in its answer, admits the receipt of the hogs, the loss of sixteen, and the value thereof as claimed by the plaintiffs. The answer also alleges "that after said hogs were received for shipment, and while in transit, there occurred a very severe,

unusual, and extraordinary snow storm, on account of which it was impossible for the defendant to move its cars, and make said shipment as promptly as it ordinarily would, and said hogs were conveyed to Omaha in the shortest possible time ; that whatever damage the plaintiffs sustained, on account of the injury to the said hogs, and the death of the same, was caused on account of said storm and extreme cold weather." The answer also denies that the defendant was guilty of any negligence in the matter. The trial was had to a jury, resulting in a verdict for the company. The case is now before us on error.

The testimony discloses that it was storming when the hogs were started from Minden on the morning of the 16th of November, that they arrived in Hastings between ten or eleven o'clock the same forenoon, and at that time the snow was drifting, and the wind blowing a gale. The train was immediately made up to go east, when advices were received that the road was blockaded, and the train was abandoned. The hogs remained in the cars until the next forenoon, when they were unloaded, and it was discovered that eleven were dead and six crippled.

· The principal question presented by the record for our consideration is, Did the defendant's employes exercise such diligence as to relieve the company from liability for damages as a common carrier? There is no conflict in the testimony as to the character and severity of the storm, or as to the efforts that were made to protect the hogs from the effects of the storm. J. K. Painter, who was agent of the company at Hastings, testified that the train carrying plaintiffs hogs arrived at Hastings during a blizzard, the wind was blowing a gale and the snow was falling ; that the train was made up to go east, and waited for advices as to how the storm was along the road. The train was then reorganized with a less number of cars, when orders were received to wait until afternoon. Then they got advices not to start a train out that day. The train was aban-

doned on account of the severity of the storm, the road
east of Hastings being blockaded.   The yards in Hastings
at that time were impassable on account of the depth of
the snow, and the high wind.   Drifts had formed that
were difficult for a man to pass through, some as tall as an
ordinary sized man.   After the train was abandoned, an ef-
fort was made to get the cars to the stock yards.   The yards
being full of snow, an attempt was then made to put grain
doors up to the sides of the cars ; that was a failure on
account of the wind.   The next morning the yards were
shoveled out, and as soon as possible the cars were taken
to the yards and the hogs unloaded, fed, and given bed-
ding.   They were kept until the morning of the 18th,
when they were forwarded on the first train leaving for
the east, after the storm.   On the evening of the 16th the
stock yards were filled with snow, the fence on the north
side was covered up, and the wind was blowing very hard.
On the morning of the 17th the yards were in such condi-
tion that the switch engine could not reach the cars until
they were shoveled out.   The witness testified further, on
cross-examination, that it began snowing early on the
morning of the 16th and continued into the night; that it
was very cold ; that an effort was made to get the hogs
to the stock yards on the 16th ; that the switch engine
stuck in the yards and remained out all night ; that the
storm was the most severe the witness had seen during
four years he had been with the road.

   G. H. Hartsaugh testified that at noon of the 16th
there was a " blizzard," and that it continued during the
afternoon and evening.   It was a very severe storm, snow-
ing very hard, wind from the north and cold towards even-
ing ; that he had seen one or two storms in the course of a
number of years, just as bad, but had never seen a worse
one.   It was growing worse all the time.

   Albert Gains testified that his business was checking
cars and taking care of the stock yards at Hastings ; that

he remembers the cars containing plaintiff's hogs; that when they arrived it was snowing, blowing, and getting colder; that they were put into a train made up to go east, and it was abandoned on account of the severity of the storm. Nothing was done with the cars containing the hogs that afternoon, for the reason that the snow had drifted too bad. By three o'clock in the afternoon it had drifted underneath the cars solid. He tried to put up grain doors on the north side to keep the wind off, but the wind blew so hard that he failed in the attempt. He says, "the one I had the wind blew it away from me, then I helped another man with his; we got about ten feet further and had to stop; there were four of us trying with the doors." The weather was cold and getting colder. The cars quit moving through the yards and switches about noon of the 16th.

John Glennan testified that it was snowing and blowing hard on the 16th; that the hogs were unloaded on the forenoon of the 17th, and were watered and fed. Before unloading it was necessary to get them out of the drift. Some of the cars were nearly covered, and the stock yards were pretty nearly covered up.

G. M. Rogers testified that the storm was severe and cold; that he tried to carry grain doors and tack them on north side of the cars, but could not possibly do so as the wind was so strong; that at noon the snow in the yards was deep and getting deeper.

George Jacobs testified that on the 16th it was impossible to see a house an either side of the street on account of the snow and wind. Witness states that he saw four persons trying to carry the grain doors to the cars, and that they got a few feet with them but could not get any further.

W. G. Melson, called as a witness for the plaintiff, testified that in cold, stormy weather, hogs once put in motion in cars, at the first delay will begin to "pile up" away from

the doors, and are likely to smother those underneath; that the proper thing to do when they cannot be unloaded is to put a man there to keep them from piling up; that while the cars are in motion there is no such danger. The witness was then asked this question upon cross-examination: "You would probably been standing there frozen to death covered with snow in the morning, with a stick in your hands?" The witness answered, "I guess so."

The plaintiff Jeppa Jorgenson testified that the hogs were in good condition when delivered to the defendant. The remainder of his testimony was the same as the witness Melson's, except that he did not think he would have been frozen to death had he remained with the hogs and given them the proper care.

That the storm which overtook the train containing plaintiff's hogs was unprecedented cannot be doubted. On account of the drifting snow it was impossible for the train to leave Hastings for Omaha on the afternoon of November 16; that the snow had so drifted as to blockade the cars in the yards at Hastings, and filled the stock pens with snow so that the hogs could not be unloaded. All reasonable efforts were put forth by the employes of the defendant to nail grain doors on the north side of the cars containing the hogs, for the purpose of protecting them from the storm.

It is contended by the plaintiffs that some one should have remained with the hogs and prevented them from smothering each other. It was for the jury to say whether in view of the severity of the storm such care should have been given. After a careful reading of the testimony we are satisfied that there was sufficient evidence to warrant the jury in finding that the defendant was not guilty of negligence in that respect.

Objections are made to certain instructions given by the court on its own motion, and to the refusal to give the instructions requested by the plaintiffs.

The fourth, fifth, and sixth of the instructions given are as follows :

"Fourth—If you find the loss of the sixteen hogs and damage was occasioned by the snow storm and said cold weather and the elements, the defendant using the ordinary care in protecting and caring for said hogs and shipped them as soon as practicable, under all circumstances you will find for the defendant.

"Fifth—If you find the defendant did not use ordinary care in protecting, caring for, and transporting the said hogs, under the circumstances you will find for the plaintiffs, assessing their damages at such sum as you think the evidence warrants, not exceeding the amount sued for in the petition.

"Sixth—Unless you find from the evidence the loss and damage complained of was occasioned by the act of God, or, in other words, the severe storm and cold, which could not have been prevented by use of ordinary care, under the circumstances you will find for the plaintiffs, bearing in mind the burden is upon the defendant to show the loss was occasioned by the storm and cold which ordinary care could not prevent, and it would require a greater degree of care; or, in other words, greater care and caution in caring for the hogs would be required in a snow storm than in ordinary fair weather."

The plaintiffs requested the following instructions, which were denied :

"First—In transporting the hogs in question the defendant, being a common carrier, was an insurer of the safe delivery of the property and was bound to use all care and precaution for their safety while in transit, so far as human vigilance and foresight and care would go.   The defendant would be absolutely liable to plaintiffs for all injuries sustained by the hogs in question while in their possession from the time they were received at Minden, Nebraska, until they were delivered to the consignee at Omaha, Ne-

braska, except only for such injuries as may have been 'unavoidable' from the essential nature of the property itself, the nature and propensity of the hogs, and except further such injuries as may have resulted from the act of God or the public enemy.

"Second—To excuse the defendant from liability on the ground that the injury to the hogs in question was caused by the act of God, the burden of proof is upon the defendant to prove to you by a preponderance of evidence that the act of God was the immediate cause of the injury. By the term 'act of God' is meant superhuman, or something beyond the power of man to foresee or guard against."

"Third—If you believe from the evidence that the loss of the hogs in question was caused by the 'piling up' and thus suffocating or being otherwise injured while the cars were standing in the yards at Hastings, Nebraska, and if you further believe from the evidence that such loss could have been prevented by the defendant unloading them into the stock pens, and while in such pens given them good bedding, care, and personal attention, or if you believe from the evidence that the defendant could have prevented the hogs in question from piling up in the cars while standing in the yards at Hastings, by vigilant watching, and thus prevented the loss, and that the defendant negligently failed to do either, then you will find for the plaintiffs, for under such circumstances the act of God was not the cause of the loss, in such sense as to exempt the defendant from the liability."

In passing upon the rulings of the district court on the giving and refusing of these instructions, we must necessarily determine the extent of the defendant's liability as a common carrier. The rule seems to be that a carrier of live stock is an insurer of the safety of the property while it is in his custody, subject to certain well defined exceptions. He is not liable for injuries resulting unavoidably from the nature and propensities of the property, nor for

damages resulting from the act of God, or the public en-
emy.   The evidence brings this case within the exception
to the general rule.   An unprecedented snow storm of such
violence as to obstruct the moving of trains falls within
the term act of God. (*Ballentine v. N. M. R. Co.*, 40 Mo.,
491; *Pruitt v. H. & St. J. R. Co.*, 62 Id., 527.)   While
carriers are not insurers against loss occasioned by the act
of God, they cannot, on the happening of such an event,
abandon the property.   What degree of care and diligence
at such a time is required in caring for and protecting the
property from injury and loss?   The plaintiffs insist that
the carrier is required to bestow the highest degree of care,
and if he fails to exercise all possible diligence, and injury
occurs by reason thereof, he is liable.

In *Gillespie v. St. L., K. C. & N. R. Co.*, 6 Mo. App.,
554, the court, in considering the degree of diligence re-
quired of a common carrier as against an act of God, say :

"By these instructions the difference between the re-
sponsibility of the carrier as against the act of God, and as
against those perils which the carrier is answerable for, is
ignored. . The carrier is held by the instructions to the
highest degree of foresight and care as against an act of
God.   But the law imposes on him no such liabilty.   It
has been truly said there is hardly any act of God, in a
legal sense, which an exhaustive circumspection might not
anticipate, and supposable diligence not avert the conse-
quence of.   So that the doctrine would end in making the
carrier responsible for acts of God, when by law the pass-
enger and not the carrier assumed the risk.   It has been
said that to make the rule a working rule, and give to the
carrier the practical benefit of the exemption which the
law allows him, he must be held, in preventing or averting
the effect of the act of God, only to such foresight and
care as an ordinarily prudent person, or company in the
same business, would use under all the circumstances of the
case."

We have carefully examined the numerous authorities bearing upon the question, and the rule established by the adjudicated cases is that the carrier is required to exercise ordinary or reasonable care and diligence to secure the property committed to his custody from loss or damage in order to protect himself from injury arising from the act of God. If his negligence contributes to the injury, he cannot claim exemption from liability. (*Morrison v. Davis*, 20 Pa. St., 171; *Railroad v. Reeves*, 10 Wall., 176; *Nashville, etc., R. R. v. David*, 6 Heisk., 261; *Denny v. N. Y. Cent. R. Co.*, 13 Gray, 481; *Sweetland v. R. Co.*, 102 Mass., 276; *R. Co. v. Anderson*, 6 Am. & Eng. R. Cases, 407; *Gleeson v. V. M. R. Co.*, 28 Id., 202; *Ballentine v. N. M. R. Co.*, 40 Mo., 491; *Pruitt v. H. &. St. J. R. Co.*, 62 Id., 527; Hutch., Carr., secs. 201, 202.)

In the instructions given the rule is stated that if the defendant did not use ordinary care in protecting, caring for, and transporting the hogs, it was liable. We were at first inclined to believe that the instructions were faulty, on account of the using of the word ordinary; but after further consideration we are satisfied that there is no substantial difference between ordinary care and reasonable care. It seems that the words are interchangeably used. (*Kendall v. Brown*, 74 Ill., 232; *Fallon v. City of Boston*, 3 Allen, 38; *Neal v. Gillett et al.*, 23 Conn., 436.)

Under the testimony, there was but one controverted fact to submit to the jury, and that was whether the defendant was guilty of negligence. The instructions taken as a whole, stated the law applicable to the case, and fairly submitted to the jury the question of negligence. The only conclusion that could have been drawn from the testimony was that the storm was extraordinary and unprecedented for that season of the year. While the charge of the court did not state, in so many words, that the act of God must have been the immediate or proximate cause of the loss, in order to excuse the company from liability, yet

that was the plain purport of the language used in the fifth paragraph. The jury could not fail to understand from that instruction that if the defendant did not use ordinary care, the negligence of the defendant was the proximate cause of the loss, and that the plaintiffs were entitled to damages.

The plaintiffs in error further contend that " there was no evidence to justify the submission to the jury by instructions the question as to whether the loss was occasioned by the act of God." True the loss occurred by the hogs " piling up," and thereby smothering those underneath, yet the propensity to do this was only while the cars were standing. If it were not possible to unload the hogs on account of the drifting snow, as the testimony tends to show, and if the defendant's employes omitted nothing that a prudent person or carrier would have done under the circumstances to avert the loss, then the loss must be attributed to the storm.

By the first instruction requested by the plaintiffs the defendant was held responsible if it failed "to use all care and precaution for the safety of the hogs while in transit, so far as human vigilance, foresight, and care would go." This was a higher degree of diligence than the law demanded of the defendant. The second request was substantially covered by the sixth instruction given. By it the jury were told that the burden was upon the defendant to establish that the loss was occasioned by the storm, and it also stated, in language easily understood, that the severe storm and cold was an occurrence known as the act of God.

The third request held the defendant liable, if, by vigilant watching, the hogs could have been prevented from smothering in the cars. It was not to be expected that any one would remain in such a storm and care for the stock.

The plaintiffs allege error on the part of the court in

making certain remarks in the presence of the jury. The judge, in ruling upon an objection made to the testimony, stated: "I shall instruct the jury that the defendant, to avoid liability, must show that it used all reasonable means to care for this stock." Subsequently, the jury were so instructed. We do not see how the language of the court could have been prejudicial to the plaintiffs.

The plaintiff, Jeppa Jorgenson, was asked this question: "You may state, from your experience in handling hogs and shipping them, if there is any danger, while a car is standing still, of their piling up." Counsel for the defendant objected, as improper, incompetent, and no foundation laid. The attorney for the plaintiffs then stated what he considered proper testimony, and the court, in reply, said: "I will allow the gentleman to prove anything he wants. I will instruct the jury what the law is when we get to that." The objection was sustained and exceptions were taken to the ruling, and to the language of judge. By sustaining the defendant's objections to the succeeding questions propounded to this witness, and to the plaintiffs' offer of testimony subsequently made, the jury could not have understood that the court intended to permit immaterial or improper testimony to be received, if offered by the plaintiffs. Better, it would have been, had the remarks not been made, yet we have no doubt that they did not influence the verdict.

The remaining assignment of error consists in sustaining the defendant's objection to this question asked by plaintiffs of the witness Melson: "State whether, from your experience, fat hogs, when in cars, would freeze to death when the thermometer was at zero or a few degrees above." The error, if any, in sustaining the objection was subsequently cured by allowing plaintiffs to fully prove the fact sought to be elicited by the question, which testimony was not controverted by the defendant.

There is no reversible error in the record, and the judgment is

AFFIRMED.

THE other judges concur.