ISAAC WARD, APPELLEE, V. CHICAGO, ST. PAUL, MINNE-
APOLIS & OMAHA RAILWAY COMPANY, APPELLANT.

FILED OCTOBER 18, 1912.    No. 17,065.

1. Negligence: "ACT OF GOD." "A snow storm of such violence as to
prevent the moving of trains is an act of God." *Black v. Chi-
cago, B. & Q. R. Co.*, 30 Neb. 197.

2. ———: EVIDENCE. In an action for damages on account of negli-
gence, the negligence must be established by direct proof, or by
showing facts and circumstances from which negligence may
reasonably be inferred.

3. Evidence examined and referred to in the opinion *held* clearly in-
sufficient to sustain the verdict and judgment.

APPEAL from the district court for Cedar county: GUY
T. GRAVES, JUDGE. *Reversed.*

*Mapes & Hazen* and *B. H. Dunham,* for appellant.

*R. J. Millard,* contra.

FAWCETT, J.

Plaintiff brought suit in the district court for Cedar
county to recover for the death of two hogs and the crip-
pling of two others, through the negligence of defendant,
while the same were being shipped over defendant's line.
From a judgment in his favor defendant appeals.

The evidence shows: That the hogs were shipped from
Coleridge, Nebraska, to Sioux City, Iowa; that the line
of defendant's road from Coleridge to Wakefield is what
might be termed a stub line. Plaintiff's shipment con-
sisted of 71 head of hogs. They were loaded at and left
Coleridge between 1 and 2 o'clock in the morning of Feb-
ruary 9, 1909, on train No. 44. Freight for Sioux City
arriving at Wakefield on No. 44 is transferred at that
point to the main line and carried to Sioux City either
on No. 56 or No. 14. When the train, of which plaintiff's

car formed a part, reached Wakefield, a snow storm of great severity was blowing and the weather was extremely cold. No. 14 was at that time stalled at Norfolk, some distance west of Wakefield, and No. 56 was stalled on the passing track east of the depot.

The conductor of No. 44 testified: That he had been in defendant's employ for 20 years; that he remembered the storm of February 9; that during the trip they had a little delay at Laurel on account of the high storm; that the storm was fierce at Laurel and he lost one of his men; that when he reached Wakefield the storm was as bad as he had "ever lived in;" that there was a high wind with falling snow and it was bitter cold; that when they reached Wakefield they got as far as the tank and "could not get on the line because the train stalled. The Bloomfield train, bound for Sioux City, was stalled on the passing track east of the depot at Wakefield; they could not get through the drifts on the track, about 200 yards from us. I didn't know they were stalled there until we worked our way to the station and found them. They went as far as they could to the side track while we got tied there. Their engine died next morning about the time ours did. I could have gone 20 or 30 yards farther. There was a drift at the main switch. The only reasonable thing to do was to stop at the water tank, with hopes of doing something after the storm was over. I kept my engine alive until 8 or 9 o'clock the next morning, when she died on us. We had to kill her to keep her from freezing up. It stormed all day Tuesday and Tuesday night, and abated some time Wednesday. When the storm abated everything was blocked wherever snow could lie; side tracks were full of snow; yard was full of snow, deep drifts, perhaps some ten feet right in front of the station; stockyards were level full of snow; snow in box cars and everything; had a regular mountain of ice around our engine. * * * This car of stock got out of Wakefield some time Thursday evening, and went out on the first train. We did everything that we could do to pro-

tect the stock. The storm was so fierce one could not see his hands before his face. It was absolutely impossible to get the cars off on Tuesday morning. * * * Q. Was it possible any time after you reached the water tank on Tuesday morning of your arrival at Wakefield until the track was opened up Thursday afternoon for you to reach the chutes at the stockyards? A. No, sir. Utterly impossible. Q. And why? A. Because of the drifts, deep drifts between there and the stockyards."

Mr. Severance, another witness for the defendant, testified: That he was a freight conductor on defendant railway; that he was at Wakefield on the morning of February 9; was conductor of No. 56; that "it was blowing very hard, a blizzard, you couldn't see anything with distinctness six feet in front of you. The storm first struck us at Wayne, where we had trouble, and it continued getting worse. When we arrived at Wakefield the tracks were covered with snow so it was almost impossible to move without going ahead and shoveling the snow off the tracks so that the sand would take a hold and keep the wheels from slipping. When we struck the yards at Wakefield we first stopped at the water tank. Then we pulled up to the main line, and headed in on the passing track. It took considerable time to get in there on account of the snow. We took the passing track to wait for 14, but 14 did not arrive. It is the train from Norfolk; 44 then came in and stopped at the water tank. We did not go out on account of the blizzard. We tried to get out, made several attempts, made one attempt to get Mr. Hoider's engine (the engine on No. 44) up there coupled onto ours, in order to proceed double headed, but we couldn't do anything. After it cleared up we started to buck snow to clear the road toward Sioux City, and went as far as Emerson, I think we got there between 4 and 5 o'clock on Thursday. We then returned to Wakefield, picked up the stock, including the cars mentioned, and went on to Sioux City. That was the first train that went through from the time the storm began. * * * Q. Was there any time Mr.

Hoider (conductor of No. 44) could have transferred his car of stock from his train to your train that morning? A. No, sir. Q. Was no time he could do that until after they got the road bucked, as you spoke of? A. No, sir." The testimony of these two witnesses is fully corroborated by defendant's station agent at Wakefield.

As against this testimony on behalf of the defendant, plaintiff testified: "Q. Do you know whether or not the company could have moved your hogs on from Wakefield without this delay you speak of? A. Yes, sir. Q. Could they? A. They could when we got to Wakefield. Could went right along with us; was no storm to bother us, no drifts, because I was out all through there." On cross-examination he shows that he knew the train he shipped on would not go beyond Wakefield; that it goes there and turns around and returns, and is not scheduled to run to Sioux City. He also testified: "I went to Sioux City on the first train that came through after the storm. This was about 10 o'clock Thursday evening. No freight trains had gone through before that time."

The witness Beig testified: That he shipped a car of hogs from Coleridge at the same time plaintiff shipped; that they left Coleridge about 1 o'clock Tuesday morning, and arrived at Wakefield about 4 in the morning; that it was snowing pretty hard. On cross-examination he testified: "The hogs were shipped in open stock cars. It was snowing, and got colder as it stormed. We stayed up to the hotel all day Tuesday, Wednesday and Thursday." On being recalled, plaintiff testified: That they stopped at Laurel en route to Wakefield about 25 minutes. "It was snowing at that time, but wasn't blowing. When we got to Wakefield, Beig and I got out of the caboose and walked up to the depot, and there wasn't a drift between there and the depot. It was snowing quite hard, but the wind wasn't blowing to amount to anything. I had a conversation with Hoider, in which he said that he was holding train for Norfolk train—that was the one that took the stock on—waiting for that one to double engines, and

this other engineer and our conductors wanted to double engines and take us to Sioux City. I was not down around the chutes that night. The Norfolk train hadn't arrived while we were there." The witness Beig, referred to by plaintiff, testified: "When we arrived at Wakefield we walked down to the depot. It was not drifted." On cross-examination he testified: "When we got out of the caboose it was blowing some and there was snow on the ground. It was snowing pretty hard and the wind was blowing."

The testimony of defendant's witnesses that train No. 14 was stalled at Norfolk, and No. 56 on the passing track east of the depot at Wakefield, is not denied. The severity of the storm is not denied, except by the statements of plaintiff and Beig that when No. 44 reached Wakefield they got out of the caboose and walked to the depot, and that there were no drifts between the train and the depot. We have read the abstract of the testimony carefully, and are unable to find anything in it which even tends to show any negligence on the part of the defendant in failing to get plaintiff's stock through to Sioux City any sooner than was done. In the face of the severity of the weather and the immense quantities of snow, the defendant's agents in charge of the trains at Wakefield were the only ones qualified to determine whether or not it was wise to attempt to move the stock in controversy from Wakefield to Sioux City on that morning. We think it is clear that, if they had attempted to do so, the train would have been unable to reach even the next station, and would in all probability have been stalled out in the country, where it would have been next to impossible to feed and care for the stock; in which event we think, under the evidence in this case, plaintiff would have had reason to complain of their having made such a foolhardy attempt. That "a snow storm of such violence as to prevent the moving of trains is an act of God" was decided by this court in *Black v. Chicago, B. & Q. R. Co.*, 30 Neb. 197. That the snow storm of February 9, 1909, was such a storm is clear.

The only testimony as to the death and crippling of the hogs is the following given by plaintiff: "I didn't see anything wrong with the hogs until Wednesday, about 10 or 11 o'clock, I saw two dead. There was two crippled when I got to Sioux City. I think they crippled them transferring. They ran a wagon box from one car to another, and got the cars as close as they could get them together, and drove them across. This was Wednesday night." It is clear from the record before us that plaintiff was accompanying his shipment of hogs, yet he does not attempt to relate any circumstance tending to show what caused the death of the two hogs, nor does he account for the crippled condition of the other two any further than to say, "I think they crippled them transferring." There is no claim that any of the hogs were dead or crippled when they reached Wakefield.

For aught that appears in the record, the two hogs may have died from disease, or may have been trampled to death by the other hogs in the car. One thing is certain, they were not killed by any bumping or rough handling of the car, for it had not been moved from its position near the water tank up to the time plaintiff says he saw them dead. There is an entire absence of evidence to show that their death was the result of any negligence on the part of defendant. In like manner, there is no testimony to show how the other two hogs became crippled, beyond the statement of plaintiff that "I think they crippled them transferring." By this he meant the transferring of the hogs from the car in which they arrived at Wakefield to the one in which they were finally taken to Sioux City, which transfer was made Wednesday night. There is nothing in his testimony, nor in the record, from which it can even be inferred that the method of making the transfer, testified to by him, was not as safe as any that defendant could have used; nor is there any testimony to show that, while making the transfer, the hogs were so handled that the crippling of the two might reasonably be inferred therefrom. There must be some-

thing more than a mere suspicion to sustain a charge of negligence. In an action for damages on account of negligence, the negligence must be established by direct proof, or by showing facts and circumstances from which negligence may reasonably be inferred.

REVERSED AND REMANDED.