## Lang *v.* Pennsylvania R. R. Co., Appellant.

[Marked to be reported.]

*Railroads—Common carriers—Bill of lading—Negligence—Loss by theft— Johnstown flood.*

A clause in a bill of lading providing that the " carrier shall not be liable for loss or damage by causes beyond its reasonable control, by riots, or any other reason not directly traceable to the negligence of the carrier's servants," will not relieve the carrier for the loss of goods stolen in open daylight in the presence of the carrier's employees, who make no offer to resist the thieves and protect the goods.

A train containing several carloads of whisky was overtaken by the Johnstown flood, but was not swept away. The train was left upon the track, and the cars were uninjured, but owing to the destruction of the track ahead it could not resume its journey. While the train was waiting for the track to be repaired, thieves, in open daylight and in presence of the train men who made no resistance, broke open the cars and seized some of the whisky. A volunteer guard of citizens interfered and protected the train during the night and part of the following day, and then destroyed the remainder of the whisky to prevent it from falling into the hands of the dangerous element in the community. The train men made no efforts to protect the train, but as soon as the thieves began to break open the car with axes, they turned their backs and left the neighborhood. *Held*, that the negligence of the company was for the jury.

In such a case the flood was not the cause of the loss, but merely the occasion or opportunity for plunder.

*Measure of damage.*

The measure of damage in such case is not limited to the valuation in the bill of lading.

Argued March 24, 1893. Appeal, No. 258, Jan. T., 1893, by defendant, from judgment of C. P. No. 2, Phila. Co., Dec. T., 1889, No. 274, on verdict for plaintiff, Lewis Lang, trading as Lang, Burnheimer & Co. Before WILLIAMS, McCOLLUM, MITCHELL, DEAN and THOMPSON, JJ.

Trespass for loss of goods by common carrier.

At the trial, before FELL, J., it appeared that the train containing ten barrels of plaintiff's whisky reached Conemaugh at nine o'clock on the morning of May 31, 1889. Owing to heavy rains the train was detained by a washout. At four o'clock in the afternoon of the same day the dam above Conemaugh broke, resulting in the Johnstown flood. About half of the cars of the train bearing the whisky were swept away, but the car containing the whisky was left uninjured standing upon the track. About six o'clock in the evening the waters subsided, and the crew of the train returned. What then occurred is described by the conductor as follows :

" We came back to the train, and when we got there, there was men wading in back and forward ; there were two or three axes; there was a kind of clasp on some of these cars; these fellows didn't understand how to open it; there was a talk about opening the door. They were there with some axes, hammering away. I said, ' Hello, boys, what is the trouble ? ' He said, ' Look here, young fellow, by God, there are five hundred people starving, and with nothing to eat, and if there is anything in the train they will have it.' I said, ' I have no use for you.' I walked about my business. In the meantime they had bursted open the car, loaded with hams and flour. I don't know whether they had just this particular car bursted open or not; I think probably they had ; we left and walked to Johnstown, and we could not do anything better ; everything was washed out; we started to walk to Johnstown; that was in the neighborhood of 6 o'clock when we left there."

A guard of volunteer citizens of Conemaugh took charge of the train about eleven o'clock in the evening.

Howard Davis, a citizen engaged in organizing a committee of protection, testified : " When it began to get daylight the people off of Prospect came there—quite a lot of them—and they wanted provisions and stuff, and of course we didn't allow them to break open any of the cars or anything. There was a few had been broken open, but we got them away. They kept on coming thicker and thicker, and we could not protect it; we nailed the cars shut. They found this whisky, and we nailed the cars, I think, three or four times, where the whisky was in. Two cars had whisky in. There was the one car had about two or three barrels in it, probably more. They broke

that open first.   We nailed it shut, but they broke it open the second time.   I told them to stay out, and I got in the car myself, me and another party.   I ordered them out.   They swore they would not go.   I throwed one fellow out, and he turned and drew a revolver on me.   The rest pushed him away from the car on one side of the car.   We closed it again.   That is about the third time.   Then by that time they had broken open this other car of whisky in front.   The first car they had broken open on the right hand, as you go in this direction, and the other car they broke open on the left, on the north side.   When we came round on that side they mashed this one open, and were going for it red hot.   There was a good many come over from Conemaugh town, and they consulted most of them that come down, and we did not believe we could do anything any longer ; they were getting too many.   There was about a hundred people there.   Q. What sort of people were they ?   A. People I never saw who came there.   I don't know how they got there or where they came from ; they were the toughest class of people I ever saw.   I never knew them and I have been raised in that neighborhood, but I don't know where they came from.   They swore they would have the whisky.   We told them they could not have the whisky, that we would empty it first; but we would not leave them have it, for we could not protect it in any other way.   Q. Why did you tell them that ?   A. They were raising a fuss then.   We were in danger at that time. We had enough to look after in the way of dead people lying around, and relieving the suffering of those left.   We had no time to lose with the whisky, and they began to get so bad on our hands at the time we could not control them any longer, and we came to the conclusion, I and about a dozen of the citizens, the best thing to do would be to destroy the whisky.   We done so as quick as we could destroy it.   In an hour's time it was quite a different place.   It was all quiet."

Another witness, David D. Gogenaugh, testified that the committee, after consultation, came to the conclusion that the best thing to do was to destroy the whisky, "in order to save property and life, because it looked very much as if there was going to be a riot there."

The bill of lading, contained the following stipulation : "The carrier shall not be liable for loss or damage by causes beyond

its reasonable control, by fire, explosion from any cause, and wheresoever occurring; by riots, strikes, or stoppage of labor, or for any of the causes incident to transportation, such as chafing, heating, freezing, leakage, rust, or any other reason not directly traceable to the negligence of the carrier's servants." The valuation in the bill of lading was $20.00 per barrel.

Defendant's points were among others as follows:

" 2. The destruction of the plaintiff's goods is affirmatively shown to have been produced by causes wholly beyond the defendant's control, viz.: First, an unexpected flood, which interrupted the means of transportation; and, second, the action of the persons who destroyed the goods as one of the necessary means of preserving the public peace and safety. Under such circumstances the verdict should be for the defendant." Refused. [1]

" 3. It is affirmatively shown by uncontradicted testimony that the plaintiff's goods were destroyed while in transit, without any fraud or gross negligence on the part of the defendant or its servants. Hence under the terms of the bill of lading the verdict should be for the defendant." Refused. [2]

4. Request for binding instruction for defendant. Refused. [3]

" 5. Under the circumstances of the present case there can be no recovery beyond the valuation in the bill of lading, namely, twenty dollars per barrel." Refused. [4]

The court left to the jury the question of negligence by defendant the day of the flood and the day after, saying, inter alia: " Could they have protected it on June 1st, either from the mob or from this committee? That is, could they have shown at that time such acts of protection as would have satisfied reasonable people that there was no danger of the mob getting it? Could they have kept it from the mob at that time? If they could it was their duty to have done so; if they could not, then the railroad company is not responsible."

Verdict for plaintiff for $926.47. Defendant appealed.

*Errors assigned* were (1–4) instructions, quoting them.

*Geo. Tucker Bispham,* for appellant.—Negligence must be affirmatively shown: American Express Co. v. Sands, 55 Pa. 140; P. R. R. v. Raiordon, 119 Pa. 577; Grogan v. Express Co.,

114 Pa. 528; Buck v. P. R. R., 150 Pa. 170 ; Weiller v. P. R. R., 134 Pa. 310.

Under the bill of lading, the carrying company was not responsible for loss occasioned by mob or by strikers: See Sherman, Hall & Co. v. P. R. R., 3 A. & E. R. R. Cas. 274; Geismer v. Lakeshore & Michigan Southern Ry., 102 N. Y. 563.

Even if the circumstances proved were not sufficient to excuse defendant from liability altogether they would seem to be such as to justify a limit of the plaintiff's recovery to the stipulated sum. The state of facts here brings the case within the ruling of this court in Farnham v. R. R., 55 Pa. 53. See also Elkins v. Trans. Co., 81* Pa. 315; Weiller v. R. R., 134 Pa. 310.

If the ultimate cause of the loss of the whisky be looked to, there should be no recovery : Long v. Pa. R. R., 147 Pa. 343.

*Thomas D. Finletter, Leonard Finletter* with him, for appellee. —Even when rioting occurs, or is imminent, the carrier owes a duty to the property intrusted to it. It is proper care under the circumstances. It is diligent and honest efforts to protect that property until all efforts are useless. The defendants are common carriers. When, therefore, the property which is delivered to them is lost or destroyed, they are responsible for that loss, unless they bring themselves within the exceptions of the special contract they have entered into with the shipper, or the exceptions of the common law. If they contend that they were not negligent, they must show by evidence that they were not negligent. If they contend that the goods were lost by violence, they must show that the property was lost; that the loss was occasioned by irresistible force; and what means they used to prevent the loss; and it is for the jury to determine the questions that may arise under that evidence.

OPINION BY MR. JUSTICE WILLIAMS, April 24, 1893 :

The defendant is sued as a common carrier for its failure to deliver a quantity of whisky shipped over its line of road. The defence set up is that the whisky was lost in the Johnstown flood. The train was overtaken by the flood but it was not swept away. After the avalanche of water caused by the breaking of the South Fork dam had passed, the train was left upon the track, and the cars were uninjured. The track above and below it was injured so that the train could not resume its

journey at once, but remained in the same place until the necessary repairs were made. The whisky claimed for in this action was not destroyed by a flood. Part of it was stolen by thieves after the flood subsided, and the rest of it was destroyed by a volunteer guard of citizens who had watched and protected the train during the night following the flood and part of the next day, as the easiest way of keeping it from falling into the hands of the same dangerous class of men who had gotten a taste of it on the previous afternoon. The flood was therefore not the cause of the loss, but the occasion, the opportunity for its plunder by bad men. The thieves came in the wake of the flood to pick up and appropriate what the more merciful waters had spared. They came to this train and began to force open the doors of some of the cars. The conductor and part, if not all, of his crew came upon the ground at about the same time. They saw an ax being used to open one or more of the cars but they made no effort to defend the train or drive away the thieves. They did not so much as remonstrate with them, or order them away; but turning their backs they surrendered the train and its freight to the tender mercies of the vagabonds who had attacked it, and went away from the neighborhood. Private citizens came soon after, drove the thieves out of, and away from, the train and stood guard over it all night and until the middle of the next day; but the train men seem to have had neither part nor lot in the effort to save the property of their employer. The reason was given by one of them while on the witness stand with a cool, deliberate heartlessness not often met with in the most hardened criminals. He said he did not try to help the citizens save the cars and their contents because he "had no orders to do so." He stood and looked on. He saw the peril of his employer's property. He saw citizens, with no personal interest involved, trying to save it, but he did not help because he "had no orders." Whether he and others like him were cowards shivering with fear in the presence of a few thieves whom unarmed citizens drove away, or were thieves at heart and in full sympathy with those who were trying to loot the cars that they should have defended, is a matter of no consequence. In either case they neglected their obvious duty. The railroad company was represented in the carriage and safe-keeping of the freight on the train by the men to whom the train had been committed. If they desert-

ed their posts and left the goods uncared for, and they were stolen or destroyed, their employer must suffer for their inefficiency.    Under the facts of this case the loss sued for did not arise from inevitable accident, or the act of God.    It did not result from insurrection or the public enemy.    It was not the work of a mob.    It was due in part to plain stealing, done in daylight, in the presence of the train men and without the slightest resistance or remonstrance on their part.    For the rest, it was due to the action of citizens who, after having guarded what remained for nearly twenty-four hours, destroyed it, when they could no longer keep up their watch over it, rather than see it consumed by the human brutes to whom it had been abandoned by the train men.

The court below disposed of this same case properly and the judgment is affirmed.