### McNEIL HIGGINS CO. v. OLD DOMINION S. S. CO.

(Circuit Court of Appeals, Seventh Circuit.  June 28, 1916.)

No. 2365.

1. SHIPPING ☞132(6)—CARRIAGE OF GOODS—ACTIONS—EVIDENCE—SUFFICIENCY.

In an action for damages arising out of a shipment of coffee, the question, whether the coffee after being wet in a storm of such magnitude as to constitute an act of God was of any value, *held* for the jury.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 487; Dec. Dig. ☞132(6).]

2. SHIPPING ☞130—CARRIAGE OF GOODS—CARE—ACT OF GOD.

After a ship has been overtaken by a storm that may be properly classed as an act of God, it is the duty of the carrier to exercise at least reasonable diligence in endeavoring to save the goods shipped and prevent further loss.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 469, 470; Dec. Dig. ☞130.]

3. SHIPPING ☞132(6)—CARRIAGE OF GOODS—ACTIONS—EVIDENCE.

In an action for damages arising out of a shipment of coffee which was caught and wet in a storm of such magnitude as to amount to an act of God, the questions whether the carrier was negligent in failing to transport the coffee to its destination, as well as in failing to take immediate steps to dry the coffee, *held* under the evidence for the jury.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 487; Dec. Dig. ☞132(6).]

In Error to the District Court of the United States for the Eastern Division of the Northern District of Illinois.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Action by the McNeil Higgins Company against the Old Dominion Steamship Company. There was a judgment for defendant, and plaintiff brings error. Reversed and remanded.

Action to recover damages arising out of the shipment of a carload of coffee. Judgment for carrier upon directed verdict.

On March 15, 1913, defendant received from plaintiff 279 bags of coffee of the alleged value of $10,000 to be carried from New York to Chicago. The shipment passed from New York City to Newport News, Va., and thence to Cincinnati, Ohio, and was there transferred to the Chesapeake & Ohio Railroad Company to be carried to plaintiff. On March 24th, at Peru, Ind., the shipment met the so-called Dayton flood and windstorm. The top of the car was blown off, and the coffee was soaked by the rain from above and by water rising until it entered the car.

Plaintiff admits that the storm thus encountered was extraordinary, unusual, and unprecedented, and constituted what is termed an "act of God." Its action is based upon carrier's alleged negligence after such catastrophe was encountered.

The defendant held the car at Peru from March 24th to April 10th, when it was taken back to Cincinnati where the coffee was offered for sale, but no bid was received. Ten days later it was taken to Chicago.

Defendant's explanation for shipping the car to Cincinnati was that all evidences of the routing as well as the name of the consignee were destroyed in the flood, and in the opinion of its claim agent Cincinnati was a good coffee market. Peru is 120 miles from Chicago, and Cincinnati is 234 miles from Chicago.

Plaintiff contends that the coffee was only partially damaged by the water at Peru, and that if the car had been promptly and properly cared for the damage would have been comparatively slight. Defendant's evidence tended to show that the coffee was first offered for sale at Peru, that the shipment to Cincinnati was made as soon as possible, and that its line from Peru to Chicago was not open prior to April 10th. Defendant's evidence also tended to show that the coffee was utterly worthless before the water receded.

The car reached Chicago April 24th and was rejected by plaintiff, and thereafter sold by defendant at public auction to coffee dealers. The amount realized therefrom was $101.01 after paying all freight charges and expenses of handling.

At the close of the trial the court continued the case for a day to permit plaintiff to furnish additional proof that defendant's line was open between Peru and Chicago at the time the shipment was made to Cincinnati. The court held the testimony offered failed to establish that fact. The request for additional time in which to secure such proof was refused.

Charles A. Butler, of Chicago, Ill., for plaintiff in error.

James Stillwell, Frank J. Loesch, R. W. Richards, and T. J. Scofield, all of Chicago, Ill., for defendant in error.

Before MACK, ALSCHULER, and EVANS, Circuit Judges.

EVANS, Circuit Judge (after stating the facts as above). Defendant contends that the District Court correctly directed a verdict in its favor for two reasons: (a) That the evidence conclusively established that the soaking which the coffee received before the water receded left it utterly valueless, and that subsequent delay, excusable or otherwise, resulted in no damage. (b) That the evidence conclusively showed the carrier was not guilty of any want of ordinary care after encountering the storm.

We are unable to agree with the defendant on either proposition.

[1] Whether the value of the coffee was totally destroyed by the rains at Peru and before the car could possibly be moved or the cargo

unloaded is hardly debatable. The car reached Peru March 24th. It left Peru April 10th. It left Cincinnati about April 20th and arrived in Chicago April 24th. If, thereafter, it brought the sum of $101.01 over and above all freight charges and expenses of sale in Chicago, it is inconceivable that the coffee was valueless when it left Peru.

The testimony of plaintiff's witnesses was that the coffee would have depreciated in value by reason of the rain, but that, if it had reached a roaster within 3 or 4 days after being soaked, its value would have decreased only about 2 or 3 cents a pound; that, if it had reached a roaster 7 or 8 days after it had been submerged in water, there would have been a reduction in value of 3 or 4 cents a pound. Its invoiced price was 14⅜ cents per pound. Indeed, it is obvious that the damage depended on the extent of the soaking and the promptness with which the coffee was properly cared for after being soaked.

There also was competent evidence showing that Chicago was the most available market for the sale of coffee, and was a larger and better coffee market than Cincinnati.

While these conclusions were challenged by defendant's witnesses, we conclude that the question of any damages as well as the amount of damage was for the jury.

[2, 3] The defendant, however, further contends that the evidence fails to show that it was guilty of any want of care after meeting this storm at Peru. We conclude that this question was also one for the jury.

The duty of a carrier to use reasonable care to protect the shipper's property from damage, after the shipment has been overtaken by a storm that may be properly classed as an act of God, is well established. Lang v. Pennsylvania R. Co., 154 Pa. 342, 26 Atl. 370, 20 L. R. A. 360, 35 Am. St. Rep. 846; Black v. C., B. & Q. R. R. Co., 30 Neb. 197, 46 N. W. 428, 4 R. C. L. § 191; Blythe v. Denver & Rio Grande R. R. Co., 15 Colo. 133, 25 Pac. 702, 11 L. R. A. 615, 22 Am. St. Rep. 403. Under such circumstances, a carrier is required to exercise at least reasonable diligence in endeavoring to save the cargo, or to prevent further loss.

When the plaintiff presented evidence that the car was consigned to Chicago, that the defendant shipped it from Peru back to Cincinnati on April 10th and there held it until April 20th, and then shipped it to Chicago, and that Chicago was a larger and better market for coffee than Cincinnati, it established facts, which, if unexplained, made a prima facie case of negligence against the carrier.

True, the carrier attempted to meet these facts by showing that its affairs were in such chaotic condition due to the flood and through no fault of its own; that the name of the consignee and the place of destination were both lost unto it. But it appears that such information was obtainable, and whether the carrier was negligent in not promptly ascertaining the destination of the shipment and the name of the consignee was for the jury. It affirmatively appears that such information was in the possession of the conductor of this train, who at all times was in Peru. It appears that the conductor kept a train book which contained "about the same as a bill of lading," and gave

Chicago as the destination of the car. The car was in a train that was obviously routed from east to west. The carrier also had available the permanent records, kept at Newport News, Va., and such records showed the destination of the car in question. Finally, it appeared that the plaintiff frequently notified defendant's agent that he had a car of coffee on the way, and the representative of the defendant notified plaintiff on April 10th (the day the car was shipped from Peru to Cincinnati) that said car was in the flood at Peru. These facts certainly made a jury question of defendant's alleged negligence in sending the car to Cincinnati without consignee's consent, and in failing to notify plaintiff of the location and condition of the car.

The defendant learned on the evening of March 24th that the top of the car was removed and that the coffee was certain to receive a soaking. Had the consignee been promptly notified of these facts, it is fair to assume that some arrangement might have been made to unload the car at Peru and avoid further loss. It appears that there was at least one concern in Peru engaged in roasting coffee. Even if there were none, there was no reason why consignee's representatives might not have gone to Peru, only a distance of 120 miles, and personally taken charge of the car.

There is evidence in the record showing that the car in question could have been moved from Cincinnati to Chicago at a date earlier than April 20th. Defendant's employé admitted that he was instructed at Cincinnati on April 15th to forward the car to Chicago. Nevertheless the shipment was delayed until the 20th, and no attempt to explain this delay was made.

Again, it affirmatively appears as an apparently uncontroverted fact that from and after March 26th the Wabash Railroad was carrying freight in and out of Peru toward Chicago. There is also evidence tending to show that freight was shipped out of Peru on defendant's lines in both directions as early as April 5th. It is true this evidence thus particularly referred to was neither conclusive nor in many respects undisputed or unexplained; but the weight of the evidence, as well as the inferences arising therefrom, was for the jury.

Other questions presented by the defendant have been eliminated by a stipulation filed in this court.

The judgment is reversed, and the cause remanded, with directions to the District Court to grant a new trial.