## Atchison, Topeka & Santa Fe Railway Company v. The People of the State of Illinois.

### Gen. No. 4,606.

1. PENAL—*action in which treble damages may be recovered not.* The fact that treble the actual damages sustained is authorized by the statute fixing the remedy, does not render the action penal.

2. RAILROAD ACT—*sections 22 and 23 construed.* Sections 22 and 23 of the Railroad Act are to be construed together.

3. RAILROAD ACT—*what not defense under sections 22 and 23.* It is not a defense to an action under sections 22 and 23 of the Railroad Act to show that a shortage of cars was caused by virtue of their use at other places and points.

4. JUDICIAL NOTICE—*of what taken.* Judicial notice will be taken of the fact that a railroad company's usual method of transporting grain is in cars.

5. DECLARATION—*when states cause of action under sections 22 and 23 of Railroad Act.* A declaration under sections 22 and 23 of the Railroad Act which alleges that the defendant company refused-to furnish cars in order to transport grain states a cause of action and is equivalent to an allegation that such company refused to "take, receive and transport" such grain.

6. RAILROAD—*duty of, to furnish transportation facilities.* A railroad corporation owes to the public the. duty of providing adequate facilities for the transportation of such commodities as it is engaged in handling, and these facilities must be sufficient to take care of the business that is usually and ordinarily done along the line of the road.

7. REMARKS OF COUNSEL—*when improper, will not reverse.* Remarks of counsel though improper will not reverse, unless it appear that prejudice has resulted.

Action under sections 22 and 23 of the Railroad Act. Appeal from the Circuit Court of LaSalle county; the Hon. RICHARD S. FARRAND, Judge, presiding. Heard in this court at the October term, 1905. Affirmed. Opinion filed June 1, 1906.

ROBERT DUNLAP, REEVES & BOYS and LEE F. ENGLISH, for appellant.

C. S. CULLEN and BROWNE & WILEY, for appellees.

MR. JUSTICE FARMER delivered the opinion of the court.

Christian G. and Charles V. Sauer, for whose use

this suit was brought and who will hereafter be called appellees, are partners under the firm name of C. G. Sauer & Son and engaged in buying and shipping grain, in the Village of Dana, LaSalle county, Illinois. Appellant's railroad is the only one running through said village. Appellees own a warehouse or grain elevator situated on or near to appellant's side track in which they receive grain purchased from farmers and from which they load it on cars to be shipped to market. The elevator was constructed for receiving and handling corn in one part and oats in another. On the 19th day of December, 1902, the corn portion of the elevator was substantially full. The oats part was filled by January 15, 1903. Appellees had purchased from farmers in the surrounding country large quantities of corn and oats, which could not be delivered until the grain on hand at the dates mentioned or at least a portion of it had been shipped out. On December 19, appellees made a request of appellant, through its station agent at Dana, for cars in which to ship out corn. Requests and demands for cars in which to ship out grain were made sometimes verbally and sometimes in writing, substantially every day from December 19, 1902, to March 17, 1903. The number of cars demanded on the different dates varied from five up to thirty. Between December 19 and March 17 appellant furnished appellees twenty-two cars. On no day was more than one car furnished, except January 3 and February 16, on each of which dates two cars were furnished. Appellees claimed, and the proof shows, that between the dates mentioned, December 19 and March 17, the price of corn and oats declined, and appellees brought this suit under sections 22 and 23 of the Act in relation to fencing and operating railroads (see sections 84 and 85, chap. 114 Hurd's Revised Statutes, 1903), to recover treble the damages claimed to have been sustained. The counts of the declaration upon which issues were joined, in substance charged that appellees were on

the 17th of March, 1903, and had been for more than a year prior thereto, engaged in buying, selling and shipping grain in the village of Dana and in the conduct of said business owned, possessed and operated for storing and handling grain for shipment, a warehouse or elevator situated immediately adjacent to the tracks of defendant, that Dana was a regular station and stopping place on defendant's railroad for taking, receiving, transporting and discharging freight and passengers, and that there was no other line of railroad passing through said village and that from December 16, 1902, to March 17, 1903, plaintiffs owned and had at all times in their warehouse large quantities of corn, oats and wheat for shipment over defendant's railroad. The declaration then avers that on said December 16, and on each succeeding day down to and including said March 17, plaintiffs offered their grain to the defendant at said station and stopping place for shipment and demanded of defendant suitable and sufficient cars for the shipment of said grain, and were ready and willing to pay the freight charges if demanded, but that in accordance with the universal custom no such requirement or demand was made, that it thereby became and was the duty of defendant to furnish plaintiffs within a reasonable time after the demand suitable cars in sufficient numbers for the transportation of said grain, but regardless of its duty in the premises, defendant "wholly neglected and refused to run in on its tracks or furnish to Sauer & Son, within a reasonable time, cars suitable in kind and sufficient in quantity for the transportation of said grain; contrary to the form of the statute in such case made and provided."

Defendant pleaded *nil debet* and a special plea averring that from the 16th day of December, 1902, down to and including March 17, 1903, defendant owned and operated a line of railroad 5051 miles in length, along which there were 463 stations from which grain was shipped over its road, from many of

them more grain than from Dana, that upon the date mentioned and during all the time from December 16 to March 18 defendant had cars sufficient to transport all grain ordinarily offered for shipment on its line, but between said dates there was an unusual and unprecedented demand for cars and that for that reason defendant was unable to furnish plaintiffs suitable and sufficient cars for the shipment of their grain on the days they were demanded, but that it did furnish them cars as soon after the 16th of December as it could and from time to time after said day and before March 17 did furnish plaintiffs cars and transport such part of their grain offered for transportation as it was able to do; that defendant furnished plaintiffs cars and transported their grain as soon as it was able to do so, having due regard to the rights of other shippers who had demanded cars before plaintiffs had; that during all the time from December 16 to March 17 all of defendant's cars that were suitable to transport grain in were in actual use on its road or had been furnished to others at different stations along its line to answer demands for cars for shipping grain and other commodities, and that defendant had no cars between December 16 and March 17 except those furnished plaintiffs that could be taken to Dana. Replications were filed by plaintiffs and issue joined. A trial was had by jury resulting in a verdict for plaintiffs for $1,250. Motions for a new trial and in arrest of judgment were overruled and judgment rendered on the verdict, from which judgment this appeal is prosecuted.

Among other questions raised by this record it is contended by appellant that the suit is upon a penal statute and is therefore a penal action, that the declaration does not state a cause of action, and that the evidence did not warrant a recovery. As before stated, this suit is based upon sections 22 and 23 of the Act in relation to fencing and operating railroads. Those sections are as follows:

Sec. 22. "Every railroad corporation in the state shall furnish, start, and run cars for the transportation of such passengers and property as shall, within a reasonable time previous thereto, be ready or be offered for transportation at the several stations on its railroads and at the junctions of other railroads, and at such stopping places as may be established for receiving and discharging way passengers and freights; and shall take, receive, transport and discharge such passengers and property, at, from and to such stations, junctions and places, on and from all trains advertised to stop at the same for passengers and freight, respectively, upon the due payment, or tender of payment of tolls, freight or fare legally authorized therefor, if payment shall be demanded, and such railroad companies shall at all junctions with other railroads, and at all depots where said railroad companies stop their trains regularly to receive and discharge passengers in cities and villages for at least one half hour before the arrival of, and one half hour after the arrival of any passenger train, cause their respective depots to be open for the reception of passengers, said depots to be kept well lighted and warmed for the space of time aforesaid."

Sec. 23. "In case of the refusal of such corporation or railroad company, or its agents, to take, receive and transport any person or property, or to deliver the same within a reasonable time, at their regular or appointed time and place, or to keep their said depots open, lighted and warmed according to the provisions of the preceding section of this act, such corporation or railroad company shall pay to the party aggrieved, treble the amount of damages sustained thereby, with cost of suit; and in addition thereto, said corporation or railroad company shall forfeit a sum of not less than twenty-five dollars, nor more than one thousand dollars for each offense, to be recovered in an action of debt, in the name of the People of the State of Illinois—the treble damages for the use of the party aggrieved, and the forfeiture for the use of the school fund of the county in which the offense is committed."

Counsel have cited no Illinois case nor have we been able to find one where the question has been presented to the Supreme or Appellate Courts of this state as it is here presented. Undoubtedly the provision of section 23 which authorizes the recovery of a penalty for the benefit of the school fund is penal and a suit brought to recover that penalty would be a penal action. But it is contended by appellees that the provision of said section authorizing the recovery of treble damages for the use of the party aggrieved is not penal but remedial. In other words, the statute should be construed to be penal or remedial according to the form of the recovery sought under it.

The only Illinois case to which our attention has been called where the suit was brought to recover treble damages under the statute here involved, is L. & St. L. R. R. & Coal Co. v. The People, 19 Ill. App. 141, affirmed in 122 Ill. 506. That suit was originally brought in assumpsit to recover simple damages for a failure or refusal to furnish cars to transport coal. More than two years after the cause of action accrued an amended declaration was filed declaring for treble damages under sections 22 and 23 of the statute. To the amended declaration defendant pleaded the two-year Statute of Limitations. A demurrer to this plea was sustained by the trial court. Just what the judgment was in that court is not stated in the opinion of the Appellate Court, but the cause was taken to the Appellate Court upon appeal by the defendant. That court held the trial court erred in sustaining the demurrer to the plea of the two-year Statute of Limitations, and, in the opinion, referred to the statute as penal and the suit to recover thereunder as a penal action. From the best understanding we can get from reading the opinions of both the Appellate and Supreme Courts, it was not contended by plaintiff that the provision authorizing a recovery of treble damages was not penal, but it was insisted by the plaintiff and not denied by defendant that other

amended declarations were filed prior to the one filed more than two years after the cause of action accrued, but as the latter was the only one contained in the record before the Appellate Court, it was the only one considered. A number of other Illinois Supreme and Appellate Court cases are cited by appellant to support the contention that this is an action on a penal statute. We have examined them, and while some of the cases were under similar statutes to the one here involved and they were denominated penal statutes, yet it does not appear that the question whether they were penal or not was controverted and discussed or even raised. So far as appears from the opinions in all the Illinois cases cited, the court was never asked to determine whether a statute authorizing the recovery of more than actual damages by the party injured was remedial or penal. The direct question has been before the courts of numerous other states, and while the decisions are conflicting, we believe it will be found the weight of the best considered cases sustains the position that the provision of the statute here invoked is remedial, and the suit therefore not a penal action.

Reed v. Inhabitants of Northfield, 13 Pick. 94, was an action under a statute allowing a party injured to recover double damages for an injury caused by a defect in a highway. The point as to whether the statute was remedial or penal was directly raised and in an able opinion by Chief Justice Shaw, wherein many authorities are cited and commented on, it was held to be remedial. In the opinion it is said: "In the present case we think the action is purely remedial and has none of the characteristics of a penal prosecution. All damages for neglect or breach of duty operate to a certain extent as punishment; but the distinction is that it is prosecuted for the purpose of punishment, and to deter others from offending in like manner. Here the plaintiff sets out the liability of the town to repair, and an injury for a failure to perform that duty. The law gives him enhanced dam-

ages; but still they are recoverable to his own use, and in form and substance the suit calls for indemnity." Then after citing and quoting from Stanley v. Wharton, 9 Price, 301, where it was held a statute authorizing a recovery of double damages for a certain injury was remedial, the court further said: "It appears to us that this is an action of similar character, and that in form and substance it is a remedial action."

In Burnett v. Ward, 42 Vermont, 80, this question is considered at great length. The opinion is interesting and exhaustive, but is too long to quote more than a few sentences from. That suit was brought by the owner of sheep against the owner of a dog to recover double damages under a statute making the owner or keeper of a dog liable to the party injured for double the damages caused by the dog worrying, wounding or killing sheep. It was contended by the defendant that the trial court erred in adopting the rule of evidence applicable to the common law action of trespass. The court said: "But it is insisted that this rule (the rule in criminal cases) applies to actions upon penal statutes for penalties and that this suit is penal so far as it allows a recovery in excess of actual damages; and therefore the same rule ought to apply to it. But where, as in this case, the main purpose of the action is the recovery of compensation in damages, the right to recover cumulative damages is incidental, and the statute is a remedial statute in contradistinction to penal statutes. * * * The only reason why the statute is penal that can be urged is that the plaintiff recovers more than his actual damages. But there are many cases in actions of tort in which the plaintiff may legally recover more than his actual damage, as in trespass to person or property." In this and the Massachusetts case above mentioned many cases, American and English, are collected sustaining the court's view, and as they will be found by reference to those cases they need not here be cited.

Stockwell v. United States, 13 Wall. 531, was a suit by the government to recover double the value of certain importations of shingles alleged to have been illegally imported, received and concealed. The statute authorized a recovery of double the value of the property, and it was contended by the defendant that it was a penal statute. In concluding the discussion of this subject the court say: "It (the statute) must therefore be considered as remedial, as providing indemnity for loss. And it is not the less so because the liability of the wrong-doer is measured by double the value of the goods received, concealed, or purchased, instead of their single value."

Aylsworth v. Curtis, 19 R. I. 517, 61 Am. St. R. 785, was a suit to recover twice the value of property of the plaintiff, alleged to have been stolen by the defendant. It was brought under a statute which provided that when a person was convicted of larceny he should be liable to the owner of the property for twice its value, unless the property had been restored, and in case of restoration, then such convicted party should be liable for the value of the property. Pending the suit the plaintiff died, and it was contended by defendant that it was a penal action and therefore did not survive. The court held the statute under which the suit was brought was remedial and not penal and that the action survived. In discussing the distinction between penal and remedial statutes the court said: "But where it is a statute which is merely declaratory of a common law right, coupled with a means or way enacted for its enforcement, giving a remedy for an injury against the person by whom it is committed to the person injured, and either limiting the recovery to the amount of loss sustained or to cumulative damages as compensation for the injury, it is a remedial statute." This opinion is also well sustained by a large number of authorities cited therein.

While there are cases not in entire harmony with this view, we have found none where the question has

been so well considered as in the cases to which we have referred and the cases cited and quoted from by the courts in those cases. The provision relating to a forfeiture, to be recovered for the use of the school fund, is penal, because there is no element of compensation to an injured party, but merely punishment to the wrongdoer. A statute may be remedial in one part and penal in another. Sutherland on Statutory Construction, vol. 2, sec. 337; Aylsworth v. Curtis, *supra.* Under the provision of the statute invoked in this case, it is an indispensable prerequisite to a recovery, that the party suing should have sustained damages. The allowing of treble the damages sustained is only an enlargement of a common law right and its primary basis is compensation. There are many cases where the law allows in addition to the actual damages sustained, a further sum as punitive damages by way of punishment, and in such actions, as in the case at bar, the recovery is for the benefit of the party injured. Here, as in Reid v. Inhabitants of Northfield, *supra,* plaintiffs set out the duty of defendant to furnish cars, its refusal to do so and consequent damages therefrom. "The law gives him enhanced damages, but still they are recoverable to his own use, and in form and substance the suit calls for indemnity." Our conclusion therefore is that the provision of the statute under which this suit was brought is remedial and not penal, and the rules applicable to remedial statutes are the proper rules to apply to it.

Appellant insists that the declaration does not state a cause of action. The point is made that the declaration is based on that clause of section 22 which makes it the duty of every railroad corporation to "furnish, start and run cars for the transportation of such passengers and property as shall within a reasonable time previous thereto be ready and offered for transportation at the several stations on its railroads," and that the liability provided for in section 23 is the refusal to "take, receive and transport any person or

property, or to deliver the same within a reasonable time," etc. The declaration charges that appellees had their grain ready, offered it to appellant for shipment and transportation at its station and demanded cars for that purpose, but that appellant "wholly neglected and refused to run in on its tracks, or furnish to Sauer and Son, within a reasonable time, cars suitable in kind and sufficient in quantity for the transportation of said grain." In our opinion these two sections of the act must be construed together and the violation of the duties enjoined upon railroad companies by section 22 creates the liability for damages or penalty provided in section 23. Section 22 makes it the duty of a railroad company to furnish and run cars and to take, receive and transport persons and property. The only object for requiring such company to start and run cars, is to enable it to take and transport persons and property. While section 23 does not mention as one of the causes of liability the refusal to furnish and run cars, it does mention the refusal to take and transport persons and property, which, as we have said, is the only object for requiring cars to be furnished and run. It will be seen, the declaration alleges appellees had ready and offered appellant their grain for shipment and transportation, but that appellant refused to furnish cars for that purpose. We may take judicial notice that appellant's method of transporting grain was in cars. Unless it provided or furnished cars for that purpose it could not "take, receive and transport" the grain, and we are unable to distinguish any substantial difference between an allegation that appellees had ready and offered their grain at the station for shipment, but appellant refused to furnish them cars for that purpose, and an allegation that appellant refused to "take, receive and transport" it. A refusal by appellant to furnish the only means it had for transportation would be a refusal to receive and transport. This we understand to be the construction put upon

these two sections in I. & St. L. R. R. & Coal Co. v. The People, 19 Ill. App. 141.

It is very earnestly contended that appellant's proof under its special plea entitled it to a verdict of not guilty. It is not denied that appellees had the grain in their elevator ready for shipment and demanded cars for its shipment every day from December 19 to March 17, following, and that during all that time only twenty-two cars, an average of one every four days, a wholly inadequate number, were furnished appellees and that they were damaged in consequence thereof. While the plea avers that defendant had sufficient cars to transport all grain ordinarily offered for shipment, but that it was prevented from furnishing them in the quantities demanded by appellees on account of an unusual and unprecedented demand for cars, it sought to prove also that on account of the anthracite coal strike in the east many of its cars had been used for carrying bituminous coal over other lines of railroad and were not promptly returned, and also that on account of an unusual drought in New Mexico during the winter of 1902 and 1903, appellant had in that territory a large number of cars it was unable to move by reason of inability to procure a sufficient quantity of suitable water to supply its motive power. C. W. Kouns testified he was superintendent of transportation for appellant and had supervision of the movement of passengers and freight and the distribution of cars between the several sections of the line, that during the winter of 1902 and 1903 appellant had from fifteen to sixteen thousand box cars suitable for the shipment of grain, but during that period more cars were demanded than had ordinarily been the case during the same period in previous years. He also testified that cars were returned very slow from points on other lines where they had been used to haul coal on account of the strike in the anthracite mines and that on account of an in-

sufficient supply of suitable water a large number of cars in New Mexico could not be moved, and that these conditions affected appellant's ability to furnish cars to shippers, such as appellees. The witness testified that appellant's system for the distribution of cars was based upon daily reports received which embraced an inventory of all cars at every station along the entire line of railroad. These reports are made at a certain hour each day and cover the twenty-four hours preceding the report. Upon receipt of the report the distribution of cars is made by the witness among the different divisions or districts according to the demand for them and the number available. The witness made the apportionment to the divisions, and the divisions or district employees made the distribution to the stations of the different districts. The division of the road in which Dana was situated extended from Chicago to Kansas City with a branch from Lexington, Mo., to St. Joseph, Mo., and a branch from Ancona to Pekin, Illinois. F. F. Dolan was superintendent of that division and George H. Sanders had charge under him of the distribution of cars in that part of the division which included Dana. Kouns also testified appellant had during the winter of 1902 and 1903 a sufficient number of suitable cars for the shipment of grain to meet the ordinary requirements during that period and that according to his recollection it had a sufficient number to meet the ordinary demands for the corresponding period during each of the five years previous. The witness necessarily had to depend upon the reports made to him by his subordinates for the information upon which he based his orders and for many of the facts and conditions testified to by him. He did not pretend to know how the cars on the different divisions were handled by his subordinates, but only testified as to the system of appellant. Whether empty cars in large numbers stood idle in the yards and on the tracks of appellant for considerable periods

of time that should and could have been furnished shippers for the transportation of grain, witness did not know, only from the reports made to him by others. Sanders testified he had charge of the distribution of cars on the division which includes Dana, but he rarely gave the subject of the distribution of cars between the different stations on his division any attention, but entrusted it, he says, to the chief dispatcher, and the distribution of cars to Sauer & Son was handled by him.  Sanders also testified the volume of business offered appellant during the month of December, 1902, and the three succeeding months, was greater than it had been for the corresponding period for some years next preceding, and that appellant's equipment of box cars was sufficient to transact the business offered the railroad prior to December, 1902. L. D. Knox, car distributor for the C., B. & Q. R. R., testified that during December, 1902, and the three months following there was an unusual amount of property offered for shipment from east to west, probably twice or three times as much as had been offered during the corresponding period in previous years. John M. Daly who was superintendent of transportation for the I. C. R. R. Co. during the winter of 1902 and 1930 testified that during that period there was an extremely heavy demand for cars on his road and that one of the main causes of it was the anthracite coal strike which largely increased the demand for cars to carry bituminous coal, and that similar conditions had not prevailed for the corresponding period during the five previous years. H. B. Forsyth was train dispatcher for appellant and testified he had to do with the distribution of cars on the division which included Dana during the winter of 1902 and 1903, that orders for cars for that station were received by him, that when he received an order it was for a station, but the name of the shipper was never disclosed to him. He testified the custom was to distribute the cars as

equally as possible, filling the oldest orders first as far as practicable, and said while he knew nothing about Sauer & Son, demands for cars for the station of Dana were treated the same as demands for other stations. Witness said he knew nothing about how many cars were in other divisions than his, but that he was not given enough cars during the period mentioned to supply the demand on his division.

In rebuttal Charles B. Sauer testified that he started on a trip to the southwest, February 4, 1903, and travelled by way of appellant's road to Kansas City, thence to Newton, Kansas, and from thence to Houston, Texas. From the latter place he went to Beaumont and Port Arthur, Texas, over another line of railroad. He was accompanied by L. M. Kelly, and testified he saw in the yards of appellant at Kansas City in the neighborhood of one hundred empty Santa Fe box cars; also that along the road in many places at stations and on side tracks miles away from a station he saw cars, sometimes three or four and sometimes a dozen in a place; that he was only in Wichita a few minutes, but while there saw in the yards in his judgment seventy-five cars of appellant's standing idle with open doors; that from Wichita south down into Texas he saw a great many cars of appellant's standing on side tracks and not in use. Kelly testified he was not taking particular notice of appellant's cars, but says he saw at least fifty in the yards at Kansas City and saw some at other places, but could not state where nor how many. Unquestionably appellant's contention that it was not bound to provide cars in advance for an unusual, unexpected and unprecedented demand, nor in anticipation of some extraordinary occurrence beyond the control of the railroad company which would temporarily prevent the rapid use and handling of all its cars, is sustained by the weight of authority. Mich. Cent. R. R. Co. v. Burrows, 33 Mich. 6, Ballentine v. N. M. R. R. Co., 40 Mo. 491, L. & N. R. R. Co. v.

Queen City Coal Co., 99 Ky. 217. But a railroad corporation owes the public the duty of providing adequate facilities for the transportation of such commodities as it is engaged in handling, and these facilities must be sufficient to take care of the business that is usually and ordinarily done along the line of the road.

In the Ballentine case, *supra,* it was said the measure of the railroad corporation's obligation is to provide sufficient equipment to take care of the business ordinarily done by the road, but, "This duty to the public must be performed in good faith, and without partiality or favor to any one. * * * As to whether the failure of defendant to receive and ship plaintiff's hogs in their proper order and within a reasonable time, was a wilful neglect or refusal to perform its duty, was a question of fact to be considered by the jury."

The burden was on appellant to prove its plea, and we are not prepared to say its proof in support of the plea was of such a character that the jury was bound to find it had proven its defense by the preponderance of the evidence. The value of its evidence in a large part depended upon whether subordinates made truthful reports to their superiors and obeyed their orders and the usual rules and methods of doing business. As to the real facts and truth in relation to these matters the witnesses who testified knew little or nothing. The testimony of appellant lacked positiveness and directness, was in many respects of the most general character and was not from witnesses who knew or claimed to know the truth about which they testified to. These things considered in connection with the rebuttal testimony offered by appellees (which we think was competent) in our opinion justified the jury in finding appellant had not proven its plea by the weight of the evidence.

It is further claimed by appellant that the proof

does not show "that any grain had been ready or offered for transportation at any station or stopping place established for receiving freights," the contention being that grain in the elevator situated upon appellant's side track was not an offer of shipment at the station. The proof shows the elevator was in such close proximity to the side track that grain was loaded from it in cars standing on the track, that the cars that were delivered to appellees by appellant were delivered at the elevator, and there is no intimation in this record that appellant at any time objected to delivering cars at the elevator, or that its failure or refusal to furnish them was because appellees did not offer their grain at the station instead of at the elevator on the side track, where the evidence shows appellant was accustomed to receive the grain.

During the argument of one of appellees' counsel, he told the jury they knew there was a combination of the transcontinental railroads, formed in the interest of the beef trust for the purpose of preventing grain from going into markets in large quantities. Counsel for appellant remarked: "I except to that as improper and not based on any testimony in the case," whereupon the court said: "I do not think there is any evidence justifying that argument."

At the conclusion of the trial, the court, on motion of defendant, also gave the jury the following instruction: "The jury is instructed that you should pay no attention whatever to any statements of counsel which are not founded upon the evidence before you, and in this connection you are instructed that there is no evidence in this case showing or tending to show any combination between the defendant railway company and any other railway company for any unlawful or improper purpose whatever."

It is claimed that notwithstanding the court's actions, the harmful effects of counsel's statements could not be removed from the minds of the jury.

The remarks of counsel complained of were highly improper and should not have been made, but the amount of the verdict we think makes it clear that whatever effect such remarks might be expected to produce in the minds of the jury, the prompt statement by the court in the presence of the jury that there was no evidence justifying such argument, and the instruction given at the close of the trial, counteracted the bad effect such remarks might otherwise have produced. The verdict was for substantially double the damages proven, whereas the statute authorized a recovery of treble the actual damages. Under such circumstances it cannot be said that the verdict was the product of inflamed minds or the result of passion and prejudice.

The views we have herein expressed and the conclusions we have reached we think render unnecessary a discussion of the court's rulings in giving and refusing instructions, or of the other errors assigned. Believing there is no error in this record that would justify a reversal, the judgment is affirmed.

*Affirmed.*